## WATSON AND WIFE vs. STONE.

[FINAL SETTLEMENT OF GUARDIAN'S ACCOUNTS.]

1. *Bill of exceptions; when necessary in probate case.*—Under section 1891 of the Code, as amended by the act approved December 12, 1857, (Session Acts, 1857-8, p. 244,) a bill of exceptions is not necessary to enable the appellate court to revise a decree of the probate court, rendered on final settlement of a guardian's accounts, when the error complained of appears on the face of the decree.

2. *Investment by guardian in Confederate bonds, and receipt of Confederate currency in payment of debts.*—Under the principles of law which are now binding on the judicial tribunals of this State, a guardian who, acting in good faith, under the authority conferred by the act of the legislature approved November 9, 1861, (Session Acts, 1861, p. 53,) received Confederate States treasury-notes in payment of debts due to his ward, and invested his ward's funds in Confederate States bonds, is entitled to credits, on final settlement of his accounts, for the amount of such investments, and for the amount of such funds remaining in his hands at the close of the war.

3. *Status of State government during war.*—The existence of this State. as a member of the Federal Union, was not destroyed by the ordinance of secession, nor by its hostile attitude towards the United States during the war: it existed as a government *de facto,* and possessed the powers which pertain to such a government.

4. *Rights of government de facto.*—The legislative acts of a government *de facto,* and acts done under their authority during its existence, are valid, and will be sustained by the courts after the overthrow of such government, notwithstanding their repugnancy to the laws of the rightful government by which it is overthrown.

APPEAL from the Probate Court of Lowndes.

IN the matter of the final settlement of the accounts and vouchers of Warren T. Stone as guardian of Susan A. V. Merriwether, a minor, now the wife of A. B. Watson. The letters of guardianship were granted by said probate court on the 13th February, 1857. The guardian filed his accounts and vouchers for a settlement on the 30th September, 1865; and the final settlement was made on the 25th November, 1865. The appeal is prosecuted by Watson and wife, who assign as error the allowance of credits to the guardian for moneys invested by him in Confederate States bonds, and for the amount of treasury-notes of the Confederate States which he had taken in payment of debts due to his ward, and which remained in his hands at the time of the settlement.

RICE, SEMPLE & GOLDTHWAITE, for appellants.—Every argument sustaining the validity of the receipt of Confederate treasury-notes and bonds by trustees, in Alabama, is radically defective and unsound, in this, that it amounts to a practical denial of *the supremacy* of the constitution and laws of the United States, in the Confederate States, during the war, or during a part of the period covered by the war. Beyond doubt, this *supremacy* is overthrown and displaced by the conquest and military occupation of *a foreign nation at war with the United States*, in that portion of territory so conquered and occupied. That is the point decided in *The United States v. Rice*, 4 Wheaton, 246. But no such effect can be produced by the act of any *belligerent*, unless that belligerent not only is in a state of war with the United States, but is also *foreign* to the United States, or *recognized* by the United States *as a State or nation, or belligerent de jure*, and as possessing all the capacities and powers and sovereignty of *a government*. For example: No such effect can be produced by any number of people of Great Britain, however great or however successful in their hostile capture and occupation of portions of the territory of the United States, unless their hostile operations occur in a war against the United States, recognized as such *by Great Britain*, or carried on by the actual concurrence of the war-making power of Great Britain.—*The People v. McLeod,*

Watson and Wife v. Stone.

1 Hill's (N. Y.) Rep. 377 ; *The Prize Cases,* 2 Black's U. S. S. C. Rep.   In other words, the displacement and overthrow of the laws and sovereignty of the United States, over a part of its territory, by military conquest and occupation of persons engaged in hostilities, can never occur, except in *that kind of public war* to constitute which " at least *two nations,* in *their corporate capacities, are essential parties."*   And no *court* can treat such war as in existence, " *until the national power (the war-making* power) of the country where the court sits, *officially declares"* or *recognizes* the existence of such war.—*The People v. McLeod, (supra.)*

Is it credible that the supreme court of the United States will decide, that the laws and sovereignty of the United States were even temporarily displaced and overthrown in the several portions of territory in *Maryland* and *Pennsylvania,* captured and occupied by General Lee during the war ?   Does the principle upon which *The United States v. Rice, (supra,)* was decided, apply to captures and occupation, by the Confederate army, of places within the territory of the non-seceding States?   Is there any authority for asserting that it does?

Before the secession of the States known as the Confederate States, it was universally admitted, that no State could overthrow, or suspend, *the supremacy* of the constitution and laws of the United States, within its limits, *without secession and war*, or one of them ; and it is universally admitted now, that *that supremacy* has never been destroyed, or suspended, in any State belonging to the Union before the war, unless that result was effected by secession and the late war, or one of them.   The inquiry, then, comes to this : Did secession and the late war, or either of them, overthrow, or suspend, even for an instant, within any seceding State, *the supremacy* of the constitution and laws of the United States ?   Secession and the late war were but an attempt on the part of the people of a minority of the States of the Union, to overthrow, within their limits, the constitution and laws and government of the United States, and to establish for themselves *a new government ;* in other words, *a new State, a new political corporation,* the corporate name of which was, "The Confederate States of

America." This attempt acquired the proportions, dignity and character of a civil war, *but failed ;* and failed *without any recognition* of this "*new State*" on the part of the government of the United States, or the government of any other nation.

The law applicable to this state of facts has been firmly settled by the supreme court of the United States, for nearly half a century. It is thus stated by that court: "No doctrine is better established, than that it belongs *exclusively* to *governments* to recognize *new states* in the revolutions which may occur in the world; and *until such recognition,* either by our own *government,* or *the government* to which *the new state belonged, courts of justice* are *bound* to consider *the ancient state of things as remaining unaltered.* This was expressly held by this court, in the case of *Rose v. Himely,* (4 Cranch, 241,) and to that decision, on this point, we adhere. And the same doctrine is clearly sustained by the judgment of foreign tribunals." This doctrine was re-affirmed and applied, in *Kennett v. Chambers,* 14 How. Rep. 38.

The application of this settled doctrine inevitably commands the conclusion, at least from the *courts,* that neither secession nor the war, nor both together, worked any *alteration* as to *the supremacy* of the constitution and laws of the United States, in any of the seceding States, during any period of the late war; and that, on the contrary, *the supremacy* of the constitution and laws of the United States, which was part and parcel of "the ancient state of things", (the state of things *before* the war,) remained and continued "*unaltered*", during every moment of the war, in every seceding State.

It is manifestly impossible to reconcile the validity or use of Confederate treasury-notes or bonds, in any of the seceding States, with *the continuiny and unchanging supremacy* of the constitution and laws of the United States. The issue of those notes and bonds was unquestionably means devised and employed by the *new State,* known as "The Confederate States of America", to establish *its own supremacy* in lieu of the supremacy of the constitution and laws and government of the United States, which it proposed

and sought to overthrow within the limits of all the seceding States. The issue and use of such notes or bonds were alike illegal, and opposed to the public policy of the United States, and to the constitution and laws thereof.

The creation itself of "The Confederate States of America" is expressly prohibited by the constitution of the United States.—Art. 1 sec. 10. Hence "the Confederate States of America" could not, within the limits of the United States, as those limits existed at the time of secession, be deemed, or taken, or recognized, by any court in the first instance, as a *political corporation*, having a lawful existence, and possessing governmental or sovereign powers, although it may have been "a belligerent *de facto*", and may have been recognized and treated as a belligerent *de facto* by the United States. The recognition of the United States government did not go beyond the recognition of the Confederate States of America as a belligerent *de facto*. There was no recognition of the Confederate States as a belligerent *de jure.*—See authorities cited in Dana's 8th edition of Wheaton's Int. Law, (marginal or bottom pages,) 374–377.

Inasmuch as the issue and use of Confederate treasury-notes and bonds were in contravention of the public policy of the United States, and of the constitution and laws thereof, such issue and use are not only void, but incapable of confirmation or healing, by the act of any State convention or legislature.—*Pettit v. Pettit*, 32 Ala. 288, and authorities there cited; *Kennett v. Chambers, (supra.)* To permit a State thus to confirm or heal what has been done in contravention of the constitution, laws, and public policy of the United States, is, to that extent, to permit a State to overthrow the supremacy of the constitution and laws of the United States, and to surrender to it that supremacy. Any act of a State, either through its legislature or convention, puporting to authorize the doing of anything in contravention of the supreme law, is null; and "a subsequent statute, ratifying and approving the original authority, could add nothing to the protection proffered by the first. It would be but the junction of two nullities."—*The People v. McLeod*, 1 Hill's (N. Y.) Rep. 424.

The constitution and laws of the United States could not, in any just sense, be deemed "the supreme law of the land", if every State could, by a healing act, impart validity to everything or anything, done under a prior act, in conflict with that supreme law. That supreme law explicitly declares, (Const. U. S. art. 6,) that "the judges in every State shall be bound thereby", (that is, by said supreme law,) "*anything* in the constitution and laws of any State to the contrary notwithstanding." All these judges take an oath to support that supreme law. How can that duty be performed, if the claims and provisions of that supreme law can be excluded from the consideration of the judges, or silenced, or disregarded, on the ground that a State has passed a healing act, or that the parties are "*in pari delicto*", or on any other ground? This supreme law requires the judges to hold as invalid *every act* of an individual, or a State convention, or a State legislature, which is drawn in question before them in a proper judicial proceeding, and which is in contravention of that supreme law. If a healing act which is contrary to the supreme law, is allowed any effect by the courts, to the extent of that effect, the supreme law ceases to be the supreme law. And so, if, upon the pretext of a healing act, or upon any other pretext, the supreme law can be silenced, or not carried into effect, as the controlling and unyielding rule of decision, then this consequence would result, that the supreme law of the land is to be treated by the courts as the supreme law, only in cases where a healing act, or some maxim, or other thing, does not interfere with it. The true position is, that the supreme law yields to nothing, but furnishes the binding rule of decision in every conceivable case, where an act contrary to its provisions is drawn in question in a proper judicial proceeding.—*Ableman v. Booth*, 21 How. 506.

It may be conceded, for the sake of argument, that, but for the said supreme law, each State might authorize trustees to receive for the debts and property of *cestuis que trust* whatever thing or things the State might choose to designate. But that concession is of no avail here. It does not touch the pertinent question, whether a State can, under the pretense of regulating the rights and liabilities of trus-

tees, authorize them to receive a currency, the issue and use of which is contrary to the supreme law.   There can be no doubt, that the design of the legislature of Alabama, in enacting that trustees might receive Confederate treasury-notes and bonds, was to maintain and enhance the value of such issues, and thus aid the Confederate States in their attempt to overthrow, within their limits, the said supreme law.   Suppose the legislature of New York, during the war, with the unquestionable design of aiding the Confederate States in their said attempt, had enacted that trustees in that State might receive the issues of the Confederate States of America; would any court hold such enactment valid? Why not?   Because of its repugnance to the supreme law. But the repugnance in that case would not have been as clear and strong as in the case at bar.   For here, the acts drawn in question are the acts of one of the seceding States —one of the States which had entered into a "treaty, alliance and confederation", with the other seceding States, and, with them, had constituted as the common agent, what they called a government, known as "the Confederate States of America", and had sanctioned the war then existing between this common agent and the United States, and all the acts then done by this common agent, including the issue of Confederate treasury-notes and bonds.   The acts here drawn in question are the acts of such a State, and were passed with the clear design, and for the manifest purpose, of aiding such common agent in the prosecution of the then existing war.   The repugnance of such acts to the constitution and laws and public policy of the United States, is manifest.

The force of the foregoing views is not varied or affected by the fact, that the late convention in Alabama was authorized by, and held under, the proclamation or act of the president of the United States, as the commander-in-chief of the army and navy thereof;—1st, because it is certain he did not in any manner profess to authorize, or authorize, that convention to violate "the supreme law of the land", or to sanction anything which had been done in violation thereof; 2d, because he himself had no right to give to any such convention the power to violate, or to sanction

any violation of, the supreme law; although he did have power to authorize the holding of such convention for lawful and constitutional purposes and ends.—*Campbell v. Hall*, 1 Cowper's Rep. 204.

Nor can the force of these views be impaired, to any extent, by the assertion that the right of the State (such seceded State) to legislate is attributed to the existence of a *de facto* government, which was *not within or under the sovereignty of the United States*—which was in actual derogation of it. For this assertion virtually claims for the legislature of such seceded State, not only an exemption from the universal test, above stated, which is applicable to every law of a foreign State (that is, a State "*not within or under the sovereignty of the United States*"); but it goes further, and claims for each State which has ever been in the Union the right to overthrow the supremacy of the constitution and laws of the United States, within its own limits, by establishing, within its limits, a *de facto* government; and on the conquest and destruction of such *de facto* government, by the United States, and on the admitted return of such State to the Union, to have the legislation of such State during the existence of such *de facto* government, however repugnant to the constitution and laws of the United States, and however much "opposed to the national policy and national institutions" of the United States, held valid by all the courts in the Union, as if there were not any such constitution or laws, or policy, or institions. Such a claim finds no sanction in adjudged cases, especially when set up in court, for a State, claiming to be a new State, which has separated from the government of which it formed part, and which had never been recognized as a new State, by the proper department of the old government.—*Rose v. Himely*, 4 Cranch, 272 ; *Gelston v. Hoyt*, 3 Wheaton, 324; *Kennett v. Chambers*, 14 Howard, 38; *Ogden v. Folliott*, 3 Term R. 726 ; *Dudley v. Folliott*, 3 Term R. 584; Wheaton on International Law, edition edited by R. H. Dana, bottom pages, 374–377, note.

It is denied that there can be a *de facto* State in the Union. But even conceding that there can be such a thing, still it is clear that the constitution and laws of the United

States are "the supreme law" in such State, as it is in every other State in the Union. Every government or State in the Union, no matter by what name called, whether it be called a *de facto* government or State, or a *de jure* government or State, has for its supreme law the constitution and laws of the United States. No State can be in the Union, if this be not its supreme law. As soon as it is established that this is not its supreme law, it is established that the State is out of the Union, and of course a foreign State. Each State is either *in or out* of the Union, at any given time. It cannot, at the same time, be both *in and out* of the Union.

A *de facto* government or State is one which is different from, and in derogation of the old one; it certainly does not consist with "the ancient state of things." Courts which recognize it cannot "consider the ancient state of things as remaining unaltered." It is only by refusing to recognize it, that courts can prove that they do "consider the ancient state of things as remaining unaltered." The question arises, then, can courts take the lead of governments (of the political departments of government), in recognizing this new state of things, different from, and in derogation of "the ancient state of things," or must the courts wait upon and follow the political departments of the government in such matters? All the authorities agree, that the courts must, in such matters, wait upon and follow the political departments; that until the political department recognizes the existence of the new state of things, " courts of justice must consider the ancient state of things as remaining unaltered."—*Rose v. Himely*, 4 Cranch, 272; *Gelston v. Hoyt*, 3 Wheaton, 324; *Kennett v. Chambers*, 14 Howard, 38.

The political department of the government of the United States did not recognize the existence of a *de facto* government in Alabama "which was not within or under the sovereignty of the United States," prior to the adoption of the legislation as to Confederate issues, now under consideration. Nor, indeed, has the political department of the government of the United States, at any time since Alabama was admitted into the Union, recognized Alabama,

or any government in it, as not "within or under the sovereignty of the United States;" but, on the contrary, has uniformly insisted that Alabama, and every thing like government within it, has been continuously, and without any intermission whatever, within and under the sovereignty of the United States. And under this state of facts, courts which recognize now the authority of the constitution and laws of the United States "must consider" Alabama, and every thing like government in it, as having been at all times, since the original admission of Alabama into the Union, "within and under the sovereignty of the United States."—Wheaton's Int. Law, edited by R. H. Dana, bottom pages 374–377, note.

WATTS & TROY, with whom were CLEMENTS & WILLIAMSON, *contra.*—1. The act approved November 9, 1861, expressly authorized the guardian to invest his ward's funds in bonds and treasury-notes of the Confederate States. The investment was reported to the court, as required by the statute, and the credit was allowed on an annual settlement. The acts of the guardian, and the decree of the court sanctioning them, were ratified and confirmed by the ordinance of the State convention, No. 26, adopted on the 28th September, 1865.

2. The acts of the guardian were done in good faith, and were in accordance with the law of the State at the time; and as the Confederate States then had complete control and dominion over Alabama, his acts can not be avoided as contrary to the laws and policy of the United States, who now have control and dominion over the State. The acts of a government *de facto*, and of those persons who are subject to its dominion and control, in accordance with its laws and policy, are valid, notwithstanding the subsequent overthrow of such government *de facto.—United States v. Rice*, 4 Wheaton, 91; *Fleming v. Page*, 9 Howard, 603; 3 Phillimore, 479, *et seq.*

3. The Confederate States were a government *de facto*. For four years they had a government, as fully and completely organized as that of the United States, and had exclusive possession and dominion over the people and ter-

Watson and Wife v. Stone.

ritory of Alabama. They were recognized as a government *de facto* by the United States ; by decisions of their courts, and by the acts of their executive and military authorities. The principles settled by the courts of the United States, in reference to the war of 1776, are applicable to the Confederate States; and they are recognized by all works on international law. In the early progress of the war, this principle was recognized by the United States courts in several prize cases, which were published and commented on in the newspapers of the day; but the official reports are not now accessible to us. Phillimore, and other writers on international law, have traced the doctrine from Alexander's conquest of Greece to the conquests of Napoleon Buonaparte ; and illustrations of it are furnished in the history of the civil wars in Great Britain, and on the continent of Europe. The Confederate States exercised, for four years, as complete dominion over the States which composed the Confederacy, as the United States ever exercised, in time of war, over any of the States. In the war of 1812–14, whenever the British obtained control and dominion over any portion of the territory of the United States, and held it for any considerable portion of time, the courts of the United States recognized such conquered territory as belonging for the time being to the territory of Great Britain, and its people as subject to her laws. The same principle must be applied to the possessions held by the Confederate States for the four years of the war.—See 3 Phillimore ch. 6 ; also, ch. 4–5.

From January, 1861, to May, 1865, the constitution and laws of the United States were completely suspended within almost the entire State of Alabama ; and, during this time, another government, and other laws, were operating within the State, with all the powers of sovereignty. The people of Alabama owed no obedience, during that time, to the constitution and laws of the United States, because they received no protection from the United States. When the power to protect ceases, the duty of obedience ceases with it. The people were bound to obey the laws of the State during the four years of Confederate dominion, and owed obedience only to the power which was able to protect them.

A. J. WALKER, C. J.—The paper which was probably considered as a bill of exceptions, can not be regarded as such. That does not, however, affect the merits of the case; for the questions upon which the rights of the parties depend, are presented in a revisable form in the decree of the court.—Session Acts, 1857–8, p. 244.

Making reasonable intendments in favor of the correctness of the decree, we find from it that the appellee, the guardian of Mrs. Watson (then a minor), on the 24th June, 1863, invested four thousand dollars of his ward's funds in Confederate eight-per-cent. bonds; that he reported such investment to the court, within sixty days, and that he is credited with the amount· actually and *bona fide* paid for those bonds. We further find that the guardian had on hand, at the close of the war, eighteen hundred dollars in Confederate treasury-notes, received during the war, and after the 9th November, 1861, in payment of debts due him in his trust capacity; and that there does not appear to have been either bad faith in its receipt, or negligence in its retention. The question of this case is, whether the allowance of these two credits was proper; and the determination of this question depends upon the validity of acts done in pursuance of the third and fourth sections of the act of 9th November, 1861, entitled "An act to authorize executors, administrators, guardians, and trustees, to make loans to the Confederate States, and to purchase and receive in payment of debts due them bonds and treasury-notes of the Confederate States, or of the State of Alabama, and coupons which are due on bonds of the Confederate States and of said State." Those sections are as follows

"All guardians, executors, administrators, and trustees, may purchase bonds of the Confederate States, or of the State of Alabama, for the estates they respectively represent, and may receive in payment of any debts due them as such, or due the estates they respectively represent, the treasury-notes of said Confederate States and of said State, the bonds of said Confederate States and of said State, and coupons which are due on bonds of said Confederate States and of said State." "All bonds, purchased, or received as aforesaid, shall be credited to the guardian, ex-

ecutor, administrator, or trustee, at the amount actually and *bona fide* paid for them, or at which they shall be *bona fide* received in payment; and all bonds so purchased or received shall be reported by the executor, administrator, guardian, or trustee, to the court having jurisprudence (jurisdiction) of the estate he represents, within sixty days after the purchase or receipt in payment of the same, unless good cause shall be shown to the court for not making the report within that time, or they shall not be so credited."

2. We decide, that under principles of law which now prevail, and are cognizable by the present courts of this State, guardians are justified in having yielded obedience, before the restoration of the authority of the United States, to the laws above quoted, and that they are entitled to credits for investments made and money received before that time under such law.

3. One argument against our decision is, that in the eye of a tribunal acting, as this does, in subordination to the constitution of the United States, and in recognition of its authority, the existence of the State of Alabama, and, of consequence, its legislative authority, must be deemed to have ceased when the ordinance of secession was passed, and the relation of the State to the Federal government repudiated, and its officers sworn to support the constitution of another and hostile organization, and the State itself placed in warlike antagonism to the United States.

We can not subscribe to the doctrine, that the existence of the State as a member of the Federal Union was destroyed. The acts of congress pending the late war, and the proclamations from the president, very clearly recognized the continuance of the State. The present president of the United States, in his proclamation of 21st June, 1865, in which he appointed a provisional governor of the State, and authorized the formation of a regular State government, very distinctly recognizes the existence of the State, but assumes that the people were deprived of a legitimate government. He therefore, by his proclamation, initiates the movement by which a legitimate government for a subsisting State could be established by the people thereof. The movement thus initiated was carried out by the pro-

visional governor to its consummation, in the formation of a constitution and the election of a full corps of State officers, including the judges of this court.

The orders and rules, in pursuance of which the people formed the present State government, can only be deduced from the authority of the president, as commander-in-chief of the army and navy, to secure a republican government to an *existing* State, whose people had overthrown legitimate government and were conquered by the United States. If the State had been reduced to the condition of a foreign country, conquered by the military power of the United States, it would scarcely be contended that the president's authority was equal to the task which he undertook and executed. Therefore, the proposition that the existence of the State never ceased, is at the foundatien of the series of events which resulted in the bestowment of the judicial authority we exercise. An estoppel is upon the mouth of every officer of the State of Alabama, from denying the continued existence of the State as a member of the Federal Union.

Whether the government of the State was a *de jure* government, whose acts, so far as they conflicted with the constitution, or were hostile to the United States, were void, it is unnecessary here to decide. It is sufficient for the purposes of this case, to ascertain that there was a *de facto* government; and we proceed to submit the arguments in support of that position.

The condition of the State during the war was this : it existed, but its government was not in harmony with the constitution of the United States, and was in actual hostility to it. There was an exercise of every function of government. There was an actual government for every purpose, in the complete exercise of all its powers. It is so plain, upon the authority of the writers on international law, that this government was a government *de facto*, that it seems unnecessary to cite authorities, or consume time in support of the proposition. A different conclusion would open a Pandora's box of evils, to go forth and add to those already resting upon us. The State existed—there was a government of the State, which, though not acting

in subordination to the constitution of the United States, was a government in fact.

4. The legislative acts of a *de facto government* are not void, even though its wrongful existence be afterwards ascertained or decided, so far as they may have been executed, or had operation. All executed acts of a *de facto* government stand on as firm a basis, as if done by a *de jure* government.—3 Phillimore on International Law, chapters 4, 5, 6, and 7, of part 12, m. pp. 741, 742, 743 ; Lawrence's Wheaton on International Law, note 171, p. 522 ; *ib.* 580, note 181 ; *ib.* p. 653. So far has this doctrine been carried, that upon the overthrow of the dynasty of Napoleon, and the restoration of the countries subdued by him to their legitimate sovereigns, proprietors of domains acquired under the authority of their *de facto* rulers were maintained in their titles to the same, with a few exceptions in some of the inferor states of Germany, whose conduct is condemned by an eminent publicist as "discreditable."—3 Phillimore on International Law, m. pp. 718, 719. And in England it has been held, that treason against a *de facto* government could be punished after the restoration of the rightful sovereign.—Lawrence's Wheaton on International Law, 526, note.

To this doctrine it seems that the courts of the United States are fully committed. During the last war with Great Britain, a port in Maine was occupied by the enemy, from the first of September, 1814, until February, 1815. During this occupation, goods were imported, and after its cessation duties were claimed by the United States upon them. The supreme court of the United States over-ruled the claim, holding that the sovereignty of the United States was suspended ; that its laws could not be rightfully enforced there, or be obligatory upon the inhabitants, who remained and submitted to the conquerors ; that by the surrender the inhabitants passed under a temporary allegiance to the British government ; that they were bound by such laws, and such only, as it chose to recognize and impose ; and that from the nature of the case no other laws could be obligatory upon them, for where there is no protection, or allegiance, or sovereignty, there can be no

claim to obedience.—*United States v. Rice*, 4 Wheaton, 246. The same question was similarly ruled by Judge Story, on the circuit, in the case of *United States v. Hayward*, 2 Gal. 485.

The proposition, that in a civil war there cannot be a *de facto* government, set up by the party hostile to the pre-existing and established government, is not sustained, either by reason or the precedents. The validity of acts done in pursuance of the authority of a *de facto* govern-ment, is sustained, upon the ground that allegiance of the subject or citizen and protection of government are recip-rocal, and that there is an overruling necessity that people should always have some government. It is, therefore, uniformly held, that when the authority of the rightful gov-ernment is overthrown in any locality, and that of another established, for any considerable length of time, by the hands of either a foreign or domestic enemy, a *de facto* government exists, to the behests of which those within its jurisdiction may, and, indeed, must submit. Obviously, the reason of the rule applies with as much force, when the authority of the rightful government is overthrown by a domestic, as by a foreign enemy. We find no sanction for a distinction, referable to the source of the antagonism which results in a hostile government, in any of the books.

Grotius, in his work on War and Peace, (book 1, chap. 4, sec. 15,) says: "It now remains that we may say something of him that usurps the government, not after he has, either by long possession, or agreement, obtained a right to it, but so long as the cause of his unjust possession continues. And certainly, whilst he possesses the empire, his acts may be obeyed; yet, not as they are his out of right, for he has none; but upon this account, that it is probable he who has the right to govern, whether king, people, or senate, had rather that his laws should, during that time, be obliga-tory, than that the people being without laws and judg-ments, there should follow the utmost confusion." The author, after discussing the right of a private man to kill a usurper in certain cases, concludes, "in a controverted right, no private person ought to determine, but obey the present possessor"; and that "thus, Christ commanded to

'pay tribute to Cæsar', because the money had his image or superscription; that is, because he was then in possession of the empire."

Foster, in his Crown Cases, (p. 188,) states the law as follows: "Protection and allegiance are reciprocal obligations.; and, consequently, the allegiance due to the crown must be paid to him who is in the full and actual exercise of the regal power, and to none other. I have no occasion to meddle with the distinction between kings *de facto* and kings *de jure*, because the warmest advocates for that distinction, and for the principles on which it hath been founded, admit that even a king *de facto*, in the full and sole possession of the crown, is a king within the statute of treason; it is admitted, too, that the throne being full, any other person out of possession, but claiming title, is no king, within the act, be his pretensions what they may. These principles, I think, no lawyer has ever yet denied. They are founded in reason, equity, and good policy." A full discussion and historical review of the question will be found in the 4th Discourse of the same author, pages 396 to 412.

The doctrine of a *de facto* government is fully sustained in the pages last above cited, in reference to the civil wars which convulsed England, and caused frequent alternations of government between the rival claimants to the throne. Lord Hale declares, that the right heir of the crown, during such time as the usurper is in plenary possession of it, and no possession thereof in the heir, is not a king, within the act on the subject of treason; and that such was the House of York during the plenary possession of the crown in the reign of Henry IV, Henry V, and Henry VI.—1 Hale's Pleas of the Crown, 104.

Lawrence, an annotator on Wheaton's International Law, supplies to us authority upon this subject, as follows: "No exception was ever taken by the most scrupulous loyalist to the acceptance by Sir Matthew Hale of a seat on Cromwell's bench of judges; nor did it operate as a disqualification for his holding the same position on the return of Charles II. No change, it is belived, has taken place in the judicial hierarchy of France, since the tumultuous days

of the first revolution, in consequence of her dynastic and other constitutional revolutions. In reference to the implied obligation of the conquered party, it is said by the most recent American author on international law, * * * that although there is a broad and obvious distinction, between an insurrection of a conquered city, or province, against the conqueror, and a revolution, it will be found, on examination, that they both rest on the same general principle—the relation of protection and allegiance, or the reciprocity of right and obligation."—Halleck on Int. Law, 792.

The rulings in English jurisprudence generally excuse and justify obedience to *de facto* governments. A memorable exception is found in the execution of Sir Henry Vane, during the reign of Charles II, under the guise of a charge founded on acts done during the Cromwell government; and this is now condemned by publicists, as alike discreditable to the judges who ordered it, and to the monarch who permitted it.—1 Lord Campbell's Lives of the Chief-Justice, 494–6. On the contrary, law-writers approve the conduct of Sir Matthew Hale, a distinguished lawyer, and a jurist of remarkable purity and ability, who, though a loyalist sincerely attached to the crown, yielded obedience to the government of Cromwell, and sat in his parliament, and in that of Richard his son, and was a judge under the usurping and under the rightful dynasty.—1 Lord Campbell's Lives of the Chief Justices, 530–5.

The government of the United States, in all its departments, has contributed materials for argument that there was a *de facto* government in the seceded States. By law and proclamation, the people were declared enemies, and intercourse between them and the people of the loyal States was prohibited. The supreme court of the United States, in the *Prize Cases*, (2 Black, 673,) declared, that the rebellion was "no loose, unorganized insurrection, having no defined boundary, or possession; but that it had a boundary marked by lines of bayonets, which could only be crossed by force, and that south of that line was enemy's territory, because it was claimed and held in possession by an *organized, hostile, and belligerent power.*"

And in the case entitled *"Mrs. Alexander's Cotton"*,

(2 Wallace, 404,) it was held, without regard to the *animus* or conduct of a widow lady toward the United States, that because she resided in Louisiana, she was *in law* an enemy to the United States, and could have no standing in any of its courts. The United States exercised no actual authority of government within prescribed limits ; the people within those limits were enemies, entitled to no protection from it, could seek no redress for wrongs done them at the bar of its tribunals of justice, and could not hold intercourse with its people ; and within the prescribed area, an organized, hostile and belligerent power existed. Was this power a *de facto* government ? If it was not, there was allegiance without protection, and a people unprotected by their rightful government, left without law, or the privilege of being governed by the power over them. Mrs. Alexander, if within the sovereignty of the United States—if at the time, for the purpose of the laws of war, a citizen of the United States—should have been permitted to prosecute her rights in its Federal tribunals. The denial of that right involves the assertion that she was, for the time being, without the sovereignty, as she was without the protection, of the United States.

Another argument advanced against our proposition is, that the Confederate treasury-notes were issued by a governmental organization in contravention of the authority of the United States, and for the purpose of making war upon it ; and that, therefore, a law which gave them currency, and contributed to enhance their value, must be void. But this argument loses all force, when it is considered that the right of the State to legislate is attributed to the existence of a *de facto* government, which was not within or under the sovereignty of the United States, which was in actual derogation of it, and the executed acts of which are not to be tried by the constitution or policy of the United States.

It cannot be argued, that the law in question was in conflict with the constitution of the *de facto* government, or of the political organization to which it had subordinated itself. It obviously did not impair the obligation of any contract. It gave no right to the debtor to tender anything but gold and silver in discharge of his debts, but

merely gave authority to receive the specified currency. It did not involve the exercise of judicial power. It is eminently legislative in its character. It is within the definition of law, "A prescribed rule of civil conduct." The distinction between a judicial and legislative act has been said to be, that the former is a determination of what the existing law is in relation to some particular thing already done or happened, while the other is a predetermination of what the law shall be for the regulation and government of all future cases falling under its provisions.—Sedgwick on Stat. and Const. Law, 167. Under this discriminating definition, the act is clearly legislative in its character.

If it be said that this law was unreasonable, and contrary to natural justice, we reply, in the language of this court, in *Dorman v. The State*, (34 Ala. 235,) "that while it is the duty of the judiciary to confine the legislative department within the constitutionally declared limits of its power, it has no right to set aside or annul a law, upon the mere ground that it conflicts with natural right, sound morality, or abstract justice."

The decree is affirmed.

BYRD, J., did not sit in this case.