## HOUSTON *vs.* DELOACH.

[FINAL SETTLEMENT OF GUARDIAN'S ACCOUNT.]

1. *Act of November 9th, 1861; unconstitutionality of.*—The act of the legislature of the 9th of November, 1861, authorizing executors, administrators, guardians, &c., to invest the property of their trust estates in Confederate bonds, currency, &c., is unconstitutional and void.

2. *Guardian; when not entitled to credit for investment.*—A guardian, who, before the war, lent the money of his ward to a firm of which he was a member, and in 1864 received payment of the debt in Confederate currency, which he converted into Confederate four per cent. bonds, is not entitled to a credit for the amount of the bonds, but is justly chargeable with the debt and interest.

3. *Guardian; liability of, for transactions in Confederate currency, how determined.*—The liability of guardians for the property which they converted into Confederate currency, or bonds, should depend upon the merits of each case, in view of all the circumstances affecting it.

Houston v. Deloach.

APPEAL from the Probate Court of Sumter.
Tried before Hon. J. R. ABRAHAMS.

The opinion contains all the material facts of the case.

T. REAVIS and E. W. SMITH, for appellant.—Appellant
had authority to lend his ward's money.—Walker's Code,
§ 2426, 2427.

The fact that he lent it to a firm, of which he was a mem-
ber, without taking security, only rendered him liable in
the event of its loss. But it was not lost for the want of
security. On the contrary, it was repaid in a currency
which he was authorized by law to take. The currency
thus taken, was invested by him in Confederate bonds,
without delay and in good faith. He was therefore ex-
onerated from liability for the money.—Acts of 1861, p. 53
§§ 3, 4.

If he had taken bond and mortgage, or personal security
from his firm ; or if he had lent the money to some other
person, on bond and mortgage, or good personal security,
he might lawfully have received Confederate treasury-notes
in payment, and have purchased Confederate bonds with
them for the estate of his ward. What difference can
there be between lending without security, receiving Con-
federate notes in payment, and bonding them, and lending
upon the security required by statute, receiving Confeder-
ate treasury-notes in payment, and bonding them ? Sup-
pose the difference is, that by lending without security, he
was guilty of a conversion, and thereby became a debtor
to his ward's estate himself? He might still pay the debt
to his ward's estate, thus incurred, by purchasing Confed-
erate bonds for his ward's estate, to the amount of his
debt. If he could lawfully receive Confederate treasury-
notes in payment of debts due his ward's estate from other
persons, why not of his own ? And if he could lawfully
purchase Confederate bonds with these notes, why could he
not purchase such bonds for the estate of his ward, to the
amount of his own debt? The statute authorized him to
receive either Confederate bonds or treasury-notes, in pay-
ment of any debt due the estate of his ward. His own

liability was a debt due the estate, if he was guilty of a conversion of the money, by lending it to his firm, without security, or by investing it on his own account, as so much capital in the firm. He, therefore, stood in the same predicament towards the estate of his ward, that any other debtor to the estate would have stood in; and might, therefore, lawfully pay his own debt with Confederate treasury-notes or bonds, in the same way, and with the same effect, that he could receive payment of the debt of any other person. If this be not so, it must be held that he could lawfully receive payment in Confederate treasury-notes, or bonds, of all debts due the estate of his ward, except his own. The statute does not admit, fairly, of such a construction. It was not passed for the benefit or protection of estates of minors, deceased persons, &c., so much as for the purpose of aiding the Confederate government in its struggle for existence, and at the same time protecting persons representing such estates, who should use the trust property for the purposes, and in the manner specified in it. Its object was as much accomplished when a guardian purchased Confederate bonds to the extent of what he himself owed the estate of his ward, as when he purchased them with means received in payment of the debts of other persons.

The statute expressly authorizes guardians to purchase bonds of the Confederate States, for the estates of their wards. Of course the statute means, that the purchase is to be made with assets of the ward's estate. Now, if appellant had had the specific money reported in his inventory, still on hand, he might lawfully have purchased Confederate bonds with that. If he had converted it to his own use, his liability for it, was as much assets of his ward's estate, as the specific money would have been, if unconverted; and with such assets, he might lawfully purchase Confederate bonds, to the extent of his liability, if he could lawfully have purchased them with the original assets.

Suppose he had resigned his guardianship, and a decree against him for the amount he lent, or put into his firm, had been rendered in favor of his successor in the guard-

ianship. His successor was authorized to receive payment of the amount due on the decree, in either Confederate bonds, or treasury-notes. Now, if a successor in the guardianship could lawfully have received payment in this manner, why could he not discharge his liability by purchasing, with his own means, for his ward's estate, an amount of Confederate bonds equal to his indebtedness?

His liability for the money of his ward's estate, which went into his mercantile firm, being assets of his ward's estate, and he having, in good faith, "bonded" these assets in Confederate bonds, § 4 of the act of February 23, 1866, (Walker's Code, § 2135), expressly exonerates him from liability.—See Acts of 1861, p. 53, §§ 3, 4; Acts of 1864, p. 89, § 1; Acts of 1865-6, p. 115, § 4; Walker's Code, §§ 11, 2135, 4232, 2425; *Watson v. Stone*, 40 Ala. 498; *Watson v. Dockery, Dockery v. McDowell, Neilson v. Cook*, 40 Ala. 498; *Beasley v. Watson, Ivey v. Coleman*.

There was no question in the court below, as to the good faith of the transaction. On the contrary, it was admitted, and there is nothing in the record to show bad faith. The evidence in the record shows the most perfect good faith, affirmatively; and if it did not, good faith would be presumed, in the absence of any evidence to the contrary.

RICE, SEMPLE & GOLDTHWAITE, *contra*.—This case illustrates the justice of the remark of a very able court, that "there is nothing in the modern management of trusts to justify the relaxation of a solitary rule for their preservation."—*McAllister v. Com.*, 30 Penn. State R., 536.

The case here cited has been cited with approval by our supreme court in *DeJarnette v. DeJarnette*, January term, 1868; and these two cases establish the correctness of the decree here appealed from.

Here is the case of a guardian who received his ward's money in sound funds before the war, putting it in the business of the firm of which he was a member, subjecting it to all the hazards of that business (a commission and factorage, and cotton buying, and cotton speculating, business), taking no note or bond for it, but having it entered on the books of the firm to his individual credit—thus sub-

jecting it to being "snatched at" by the firm if he got behind with them, or "attached," or proceeded against by a creditor of his, as his individual property.—*McAllister v. Com.*, *supra*.

No plainer case of departure from "the line of his duty," as prescribed by law, can be shown, than is here presented against the guardian.

And the rule is, that any departure from the line of his duty, subjects him to all subsequent hazards or losses, in respect to the particular fund.—*Gerald v. Bunkley*, 17 Ala. 170, and cases there cited.

The guardian, after trading and speculating with his partners for years, with the funds of the ward, not pretending that he has not made large profits, gives no account of the profits, but retains them to himself, and then, in 1864, when Confederate treasury-notes were almost valueless, receives such notes from his firm (in law, from himself) in payment, as it is called, of the debt of the firm to himself, as an individual ; and then asks the court to treat these worthless notes as the money of the ward, which he (the guardian) invested in four per cent. Confederate States certificates.

The treasury-notes which the firm sent to the guardian, and which he invested in said certificates, were not, even when received by him, the property of the ward. The guardian, by his own conduct, had converted the ward's money long before 1864, and by this conversion, had created a new relation between the guardian and ward, the relation of debtor and creditor. The guardian was from the time of that conversion, not only the trustee, but was also the debtor of the ward, to the extent of the fund converted. And being thus the debtor, he could not discharge that liability by receiving from his partners Confederate notes, or investing in four per cent Confederate certificates. No statute of Alabama ever authorized or purported to authorize a guardian who had by his own breach of duty, and by a conversion of his ward's funds, become the debtor of his ward, afterwards to discharge that liability in the mode here attempted by Houston.

Houston had no power to make the treasury-notes, which

he received from his partners or firm, the money of the
ward or the property of the ward. The ward refuses to
recognize them as his property.

B. F. SAFFOLD, J.—The appellant, as guardian of the
appellee, on the final settlement of his guardianship, on
the 18th of January, 1868, claimed a credit for $5,000 of
Confederate four per cent. bonds. He alleged that he had
procured them with Confederate treasury-notes, received
by him in 1864, in payment of a debt due to him as guard-
ian of his ward, under the authority of an act of the
legislature, approved November 7th, 1861.

The allowance of the credit was contested, and the evi-
dence adduced on the trial established the following facts :
Mr. Bush, the former guardian of the Deloach children, of
whom the appellee was one, having previously transferred
the guarndianship to the appellant, paid him on the 3d of
January, 1860, $9,919.26, and on the 26th of September,
1860, the further sum of $4,792.86, belonging to the said
minors. These sums, when received, were entered to the
credit of the appellant ; the first on the books of Woolf,
Houston & Co., and the second on the books of Houston,
Sims & Co., the successors of the former firm, he stating
at the time that the funds were the property of the De-
loach children.

In March, 1864, the entire amount was paid to the ap-
pellant by Houston, Sims & Co., in Confederate treasury-
notes, he declaring that it was to be invested in Confeder-
ate bonds for the Deloach children. The appellant held
no bill, or bond, or note, for this money, and had no
security, personal, by mortgage, or otherwise, while it was
in the possession of these firms. He was a member of the
firm of Woolf, Houston & Co., composed of himself and
R. G. Houston, from 1855 to June, 1860, and a member of
the firm of Houston, Sims & Co., from June 1st, 1860,
throughout these transactions. On the 29th of March,
1864, he, as guardian of John Deloach, the appellee, pro-
cured the $5,000 of four per cent. Confederate bonds, with
the Confederate treasury-notes above mentioned, and his

24

action was ratified and confirmed by the probate court, on the 16th of May, 1864.

The court, on the final settlement, refused to allow the credit, and charged the guardian with the amount and interest. The correctness of this judgment is the matter to be determined.

The guardian having received the money of his ward, loaned it to a firm of which he was a member. He took no obligation or security for its repayment. It was entered on the books of the firm to his individual credit. Nothing distinguished it from his own property but his declarations to his partners. As a member of that firm, he was individually liable to the ward for the entire amount. It was a loan to himself; a conversion of the property.

Unless the act on which he relies for protection is valid, it may be unnecessary to inquire whether he could pay his own debt to his ward in Confederate currency, as well as receive it in payment from others.

Minors are the peculiar objects of the law's care. The government properly assumes the guardianship of their persons and property. In view of the law, discreet persons are chosen as the trustees, bonds are required for their fidelity, strict rules are prescribed for their guidance, and a special court is provided to exercise rigid surveillance over the due management of the ward's interests. These trustees are, ordinarily, not even shielded from liability by such care as a prudent man is apt to take of his own affairs, if they violate the regulations circumscribing their conduct. This is the general course of the law. The federal and State constitutions both forbid the citizen to be deprived of his property, without due process of law. "Every citizen is entitled to hold his life, liberty, property and immunities under the protection of general rules which govern society." Every thing which may pass under the form of an enactment, is not the law of the land. The words "due process of law," were intended to secure the individual from the arbitrary exercise of the power of government, unrestrained by the established principles of private rights and distributive justice.—*Bank of Columbia v. Oakley*, 4 Wheat. 235; Cooley on Const. Lim., p. 353,

Houston v. Deloach.

355. The act of 1861 was special legislation. It was a departure from the general law, having for its purpose, aid to the war against the United States. The welfare of the children of the State was wholly disregarded, and their entire property was staked on the hazard of successful revolution. This act deprives the ward of his property without due process of law, by substituting for it that which is not property. It impairs the obligation of contracts by exchanging his solvent credits for what is not gold and silver, or their equivalent. These objections would attach to it, if it had been the act of a lawful legislature. In addition, it was the legislation of an insurrectionary government in support of rebellion against the United States. For all of these reasons, it was void.

The guardian, then, must be thrown upon his individual responsibility. If the rightful laws of the State, and their due administration, were suspended, so that the proper direction and authority to him to act could not be obtained, and out of concern for his ward's interest, he took such action as a prudent and efficient man would have taken in the management of his own affairs, then, in equity and good conscience, he ought not to suffer. The numerous instances in which guardians, executors, and administrators have become complicated with transactions in Confederate treasury-notes and bonds, ought to stand each on its own merits. There may be cases where the solvent credits of a ward, possessed by the guardian, before the war, were well collected in Confederate currency, on account of the threatened insolvency of the debtors. But great discrimination should be exercised in such cases. The entire field of his discretion should be surveyed, and when he prudently received payment in such currency, he ought speedily to have invested it in substantial property.

During the progress of the war, in the absence of any lawful currency, trustees were obliged, in the necessary administration of their trusts, to incur expenses, for the payment of which, a sale of some property, or the collection of interest on credits was necessary. Where this was done judiciously, the trustees ought to be held harmless,

though the currency perished in their keeping. But when property or solvent credits were sacrificed by the indifference or infidelity of the trustee, or by his sympathy with the rebellion, he ought to be made liable for such loss. No general rule can be laid down to test the liability of guardians in these cases. A due regard for the rights and interests of both the trustee and the beneficiary should be sedulously observed. The trustee should not be held to a degree of success beyond human capacity to achieve, nor should the child be made to pay for the folly, caprice, or disloyalty, of one who had the discretion of free action, and the observation and experience of manhood. Trustees were not at liberty to meddle in this illegal and disloyal currency, further than the insurrectionary power, and the necessity of circumstances compelled them to do.

In the case under consideration, the guardian, in effect, used the money of his ward obtained before the war, and in the third year of its duration, set apart to him this currency, worth not one-thirtieth of what he received, and rendered still more precarious by the necessity of a forced conversion into four per cent., bonds, or by a tax of $33\frac{1}{3}$ per cent, to be afterwards increased to 100 per cent. A prudent person would not so have disposed of his own property.

The decision of this court in the case of *Watson v. Stone*, 40 Ala. 451, is based solely on the idea, that the government which existed in the State during the war, was a *de facto* government. This decision on that point, has been overruled in the case of *Chisholm v. Coleman*, decided at the January term, 1869, and in the case of the *State of Texas v. White et al.*, at the last term of the supreme court of the United States.

It may be insisted that transactions which had occurred under the authority of the act of 1861, were ratified and confirmed by ordinance 26, of the State convention of 1865. That ordinance did not seek to, and could not, confirm what was unconstitutional.

The judgment is affirmed.