## HILL, ADM'R, *vs.* ERWIN ET AL.

[DEBT ON PROMISSORY NOTE GIVEN TO SECURE PURCHASE-MONEY OF LAND SOLD UNDER AN ORDER OF PROBATE COURT IN 1863.]

1. *Decedent's lands, sale of, under order of probate court; promissory note given to secure purchase-money of, what defense can not be set up against.* In an action of debt on a promissory note, for "dollars," given to secure the purchase-money of lands of a decedent, sold in this State, in

the year 1863, under an order of the probate court for the payment of debts, it can not be shown in defense, after the return and confirmation of the sale in the probate court, that the sale was for Confederate treasury-notes, and not for "dollars," in some lawful currency of the United States. (SAFFOLD, J., *dissenting*.)

2. "*Dollars;*" *meaning of.*—If such a sale is permitted to stand, the word "dollars" in such note must be construed to mean such dollars as would be a legal tender in payment of debts. (SAFFOLD, J., *dissenting.*)

APPEAL from the Circuit Court of Hale.
Tried before Hon. JOHN MOORE.

The facts upon which the case turns are sufficiently set out in the opinion.

ALEX. WHITE, for appellant.

[Appellant's brief did not come into Reporter's hands.]

WM. M. BROOKS, *contra.*—The main question raised by the charges asked on behalf of the plaintiff, is, whether an administrator who sells land under the order of the probate court can make an agreement to receive Confederate money in payment, which will be available to the defendants?

The court authorized the sale of the property upon a credit of twelve months. Confederate notes were at that time, and it was evident would continue to be for a long while then to come, the common currency and only circulating medium of the country. All property was sold for and paid in that kind of money. It stood as the measure of the value of property whenever it was sold. There was no other means whereby to estimate the value of property. The sale, though made under the orders of the court, was not made, and was not expected or intended to be made, upon terms different from those upon which sales were generally made. It could not be expected that a purchaser would bid the value of the land in depreciated currency, and pay the amount thus bid in good money. The authority on behalf of the administrator to agree to take Confederate money might be well implied. Under no other circumstances could a sale have been made for the price bid.

But the cases are numerous to show that an administrator can enter into binding stipulations not apparently authorized by the order of sale. He may warrant the soundness of the property sold, and in such case a breach of warranty would enable the purchaser to defend an action on the note for the purchase-money.—*Stoudenmire v. Williamson,* 29 Ala. 558 ; *Pow v. Bradley,* in manuscript.

He may commit a fraud upon the purchaser, and in such case the purchaser can set up the fraud as a defense to the suit upon the note given for the purchase-money.—*Atwood's Adm'r v. Wright et al.,* 29 Ala. 351 ; *Rice v. Richardson,* 3 Ala. 428.

In these cases the administrator was not authorized by the court to warrant the soundness of the property in the one instance, or to *perpetrate a fraud* upon the purchaser by misrepresentation in the other; yet, in either case, his acts were held to be binding upon the estate and available to the purchaser. These cases clearly lay down and settle the principle in controversy. The land was sold at its value in Confederate notes, (which was several times its value in good money,) to be paid for in the same kind of currency ; to hold the purchaser bound to pay the amount in good money, would be a gross fraud upon him. And however innocent the court or the distributees might be in the inception of the contract, yet if they attempted to make the purchaser pay the entire amount in good money, they would be participators in the fraud.

In legal contemplation, it is as much against conscience to attempt to avail one's self of the iniquity of an agent, after it is known, as if there had been preconcert.—29 Ala. 351 ; 3 Ala. 428.

And though the administrator was not authorized to deceive and defraud the defendant, and thereby procure a much larger price for the property, yet it would be as iniquitous to enforce the payment of the entire amount in good money, as if the court had expressly authorized the perpetration of the fraud.—29 Ala., *supra.*

PETERS, J.—This was an action of debt brought by Susan Hill, as the administratrix of the estate of Charles

W. Hill, deceased, against George Erwin and Allen C. Jones, on a promissory note for $40,386 98, payable to said Susan Hill, as administratrix as aforesaid. It was tried in the circuit court of Hale county, on the 10th day of October, 1867, when a verdict and judgment were rendered for the defendants, Erwin and Jones. From this judgment, Mrs. Hill appeals to this court.

From a bill of exceptions taken at the trial, it appears that Mrs. Hill, as the administratrix of the estate of her husband, Charles W. Hill, deceased, obtained an order of the probate court of the county of Greene, in this State, to sell the real estate of said deceased for the payment of debts. This order of sale seems to have been regularly made and granted, and under its authority, and in conformity to the same, she offered for sale certain lands of her said husband, which are described in said order by their proper land office designation, on the 10th day of February, 1863. At said sale, said Erwin became the purchaser of said land, at the sum of $40,386 98, and gave his note for this sum, with securities as required by law, payable on the 1st day of March, 1864. The proceeding on this sale was returned to the judge of probate, who had ordered the same, and the sale was confirmed as required by the statute in such case made and provided. The order and sale upon the face of the record appear to have been perfect and regular. It was a judicial sale. The law, then, fixes its terms, and denies to the administratrix the power to sell on any other terms. But there is no attempt to impeach the regularity of the sale.

The only question, then, raised is, whether a sale by an administratrix of the real estate of the deceased for the payment of debts, which appears regular on its face, and which purports to have been made on a credit for a certain sum, payable in "dollars," can be shown, in such a proceeding as this, to have been made for Confederate treasury-notes or bonds.

Such a sale must be for money; either to be paid down at the conclusion of the sale in cash, or at a future time, on the termination of the credit allowed. But when the debt thus contracted becomes due, it must be paid in

money, unless the representative choose to release it, for something else in lieu of money, which the law permits her to receive. In this sense, money means a currency, which is a legal tender in payment of debts, or a currency which is convertible into silver or gold.—*Kitchell, Adm'r, v. Jackson,* June term, 1870 ; Const. U. S.. Art 1, §§ 8, 10. This is the legal effect of the sale, and the parties had no authority to disregard it. At law, the sale is not open to explanation on this question. It could just as well be permitted to be shown, against the averments of the record, that there was no sale, as to be shown that there was an illegal sale. If the sale stands, it must stand as the law requires it to have been made ; because the law, through the agency of the probate court, dictates the terms of the sale. If the record shows that these terms have been complied with, it can not be shown that the record speaks falsely. The order of sale and the confirmation of the sale are a part of the record, and these show the terms of the sale and a compliance with them, in the sale.—*Saltonstall and Wife v. Riley et al.,* 28 Ala. 164; Rev. Code, §§ 2079, 2078, 2080, 2081, 2082, 2086, 2089, 2090, 2091, 2095.

The laws of this State in force at the commencement of the late rebellion continued in force until its suppression, except, possibly, the statute of limitation.—*Michael v. The State,* 40 Ala. 361 ; *Coleman v. Holmes,* January term, 1870. And there was no competent authority within the State during the rebellion to enact valid laws. The legislature of the insurgent government, in this State, during this period, can not be regarded as a lawful legislature, or its acts as lawful acts—*Texas v. White,* 7 Wall. 700, 732. There was no law, then, passed by the insurgent government, in this State, during the insurrection, that can, in any manner, effect this sale, or which can make Confederate treasury-notes money, in the sense that is contended for by the appellees.

Confederate treasury-notes can not be said to be "money" in any just legal sense whatever. They were the creatures and offspring of a political organization, which was forbidden by law. The power that put them in circulation

43

refused to make them a legal tender in payment of debts. They were issued to aid the military operations of the insurgents, in their attempt to overthrow the government of the Union. They were contraband and illegal, as the instruments of an illegal purpose. It would seem childish and silly to suppose, that a war, of the magnitude of the late rebellion, could be carried on, for any considerable length of time, without money or credit. Money the rebels did not have; and the Confederate treasury-notes supplied them with credit. They were a portion of the hostile machinery of the insurrection. They were wholly vicious, because they were the creatures and instruments of a vicious purpose. It is a well known historical fact that the rebel army could not have been kept in the field after the success of the national blockade of the Southern ports, without their instrumentality. To give them validity or credence in any sense is to affirm, so far, the validity of the power that brought them into being. If rebellion is treason, if levying war against the government is treason, they were tainted with treason through and through. They owed their very being, their intent and their use, to this source. They could not, then, be "money" in any constitutional legal sense. The only legal money known in the Union, then or now, was that which the law of the land recognized as a legal tender in payment of debts, or that which was convertible into such legal tender currency.— Const. U. S., Art 1, §§ 8, 10; *Hepburn v. Griswold,* 8 Wall. 603; *Powell, Adm'r, v. Henry,* 27 Ala. 612; *Aicardi v. Robbins,* 41 Ala. 541.

Confederate treasury-notes never did come up to these requisites. Their very payment was, from the beginning, highly problematical, and in the end, they became mere nullities.—40 Ala. 451. Such a currency was not that which was contemplated by the statute authorizing and regulating the sale of decedent's estates, for the payment of debts, by their representatives. These notes were not the lawful circulating medium of the country.—*Mann v. Mann, Exr's,* 1 John. Ch. pp. 231, 232; Co. Litt. 207, *a*; 13 East, 20; *Hale Houston v. Sims & Co.,* January term, 1870; 8 Bac. Abr. Bouv. p. 37, *(B.)* 8.

The Confederate States government had no authority to to do any legal act which, on account of its origin, was entitled to recognition as of legal force in any legal rightful court of the rightful legal State of Alabama. In law it is unknown as a legal, lawful authority. Its force may create a necessity, which may excuse the commission of an illegal act. But this necessity, like any other excuse or license, is a matter of defense, and must be alleged and proven.—3 Stark Ev. 1151, marg. x, 1 ; Greenlf. Ev. § 79. The insurgent governments were all illegal governments. The purpose for which they were erected made them illegal and wholly void.—7 Wall. 700, 732, *supra*. This was an illegal purpose. They were erected to carry on a war against the government of the United States, treasonable in its character. They did not grow up out of any overruling necessity. They were established for the purposes of treason. This inevitably made the whole bad. There was no necessity to justify them. They were, therefore, in a legal sense, wholly illegal and wholly vicious. They were not like the case at Tampico in Mexico, or that at Castine, in Maine. In both these latter instances, a legal, rightful and *acknowledged* government, by force of arms, in a lawful war, drove out a lawful, rightful, *acknowledged* government, and took its place, for a legal, rightful purpose—a purpose justified and allowed by the laws of nations.—Const. U. S., Art 3, § 3, cl. 1 ; Paschall's Ann. Const. p. 211, note 215 ; *Ex parte* Bollman, 4 Cranch, 75; *Burr's Trial*, 4 Cranch, 469, *appendix* ; *Patton, Governor, v. Gilmer*, 42 Ala. 548 ; *United States v. Rice*, 4 Wheat. 246 ; *Fleming v. Page*, 9 How. 603. Here there was no such thing as legal authority, in any of the Confederate governments. They were mere military dominations. They had no national *acknowledgment* as governments of any kind. They were, therefore, neccessarily *unknown* to the courts of the rightful, lawful government, as political powers in any recognized, legal sense. Their *de facto* character did not confer any legal powers upon them, or upon their acts. They were nullities, in law. Such are the doctrines taught in *Scott v. Jones*, 5 How. 343, and *Luther v. Borden*, 7 How. 1, 38, at bottom. It seems to me, that to

set them up as legal and authorative *de facto* governments, without competent legislation for that purpose, is a fatal mistake. This would be, in a greater or less degree, a destruction of all rational distinction between patriotism and treason, loyalty and disloyalty to the government of the Union.—*Vide Walker, C. J., arguendo, in Watson & Wife v. Stone,* 40 Ala. 451, 465, par. 4; Lawrence's Wheat. Intern. Law, page 226, note. In point of law, it is the purpose, the intent, which makes the act vicious and void, not the person who commits it, or the manner in which it is done. 42 Ala. 548, *supra;* 7 Wall. 732, *supra; Kennett v. Chambers,* 14 How. 39; 1 Russ. Cr. 1. Does the grace or skill with which the fatal blow is stricken, or the numbers or high standing of those who strike, turn murder into manslaughter? Is a fleet of piratical ships more lawful than five, or does the crime diminish as the power to commit it becomes more dangerous and irresistible? Certainly not. No such doctrines have yet found secure lodgment in the courts of this country, and it may be hoped that they never will. Chief-Justice Marshall, in Bollman's case, alluding to treason, but holding the balance of justice with a giant's hand, has said, " as there is no crime which can more excite and agitate the passions of men than treason, no charge demands more, from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry be directed to the facts or to the law, none can be more solemn, none more important to the citizen or to the government; none can more effect the safety of both."—4 Cranch. 125, at bottom. It is, in my judgment, a matter equally as solemn and important to the safety of the government and its loyal citizens, that governments erected to commit this great crime shall not have recognition in the courts of this State, as legitimate political organizations in any sense whatever, without the aid of legislative ratification or adoption.—Conv. 1867, Ordins. Nos. 16, 37, 38, 39, 40 ; Pamph. Acts, 1868, pp. 167, 185, 186, 187.

This case is different from that of *Thorington v. Smith,* 8 How. 1. In that case the parties made the terms of their contract themselves; and they could affix whatever

meaning they pleased to their words. They could make the word "dollars" mean gold or "greenbacks," or Confederate treasury-notes, if they wished it. And if there was an ambiguity about its meaning, as they applied it, this ambiguity could be removed by parol proofs. It could be thus shown what they intended by the word.—1 Greenlf. Ev. § 288. They might also measure the price in cotton or tobacco, or any other specific thing. But in this case, the law fixes the terms of the contract and the meaning of the words used. This contract the parties can not contradict or explain, so as to defeat the purpose of the law. There is no duplicity about the language or the purpose of this contract. It is as the law required it to be made, and it can not be altered by parol explanations. It must, therefore, stand as it is written.—Greenlf. Ev. § 275, *et seq.* Confederate treasury-notes can not supply the place of money in this instance. They are not "dollars," in such a case as this.

The fourth charge asked by the appellant, in the court below, was in conformity with this construction of the law, and it was error to refuse it.

It is presumed that this exposition of the statute regulating the sale of the real estate of decedents, by their representatives, will furnish a solution of all the other questions raised upon the bill of exceptions in this case; therefore, they will not be further considered.

The judgment of the court below is reversed, and the cause is remanded for a new trial.

The chief-justice concurs in the result of this opinion.

B. F. SAFFOLD, J., *(dissenting.)*—Inasmuch as the probate court was authorized, and almost required to regard Confederate treasury-notes as a valid payment for land sold under its decree, if the evidence showed the vendee purchased it with the understanding that it might be paid for in such currency, and on that account brought a nominal price greatly in excess of its value, it seems to me that he is entitled to relief as in cases of individual contracts.