## HEPBURN *v.* GRISWOLD.

1. Construed by the plain import of their terms and the manifest intent of the legislature, the statutes of 1862 and 1863, which make United States notes a legal tender in payment of debts, public and private, apply to debts contracted before as well as to debts contracted after enactment.

2. The cases of *Lane County* v. *Oregon, Bronson* v. *Rodes,* and *Butler* v. *Horwitz* (7 Wallace 71, 229, and 258), in which it was held that, upon a sound construction of those statutes, neither taxes imposed by State legislation nor dues upon contracts for the payment or delivery of coin or bullion are included, by legislative intent, under the description of "debts, public and private," are approved and reaffirmed.

3. When a case arises for judicial determination, and the decision depends on the alleged inconsistency of a legislative provision with the Constitution, it is the plain duty of the Supreme Court to compare the act with the fundamental law, and if the former cannot, upon a fair construction, be reconciled with the latter, to give effect to the Constitution rather than the statute.

4. There is in the Constitution no express grant of legislative power to make any description of credit currency a legal tender in payment of debts.

5. The words "all laws necessary and proper for carrying into execution" powers expressly granted or vested have, in the Constitution, a sense

_____

equivalent to that of the words laws, not absolutely necessary indeed, but appropriate, plainly adapted to constitutional and legitimate ends, which are not prohibited, but consistent with the letter and spirit of the Constitution; laws really calculated to effect objects intrusted to the government.

6. Among means appropriate, plainly adapted, not inconsistent with the spirit of the Constitution, nor prohibited by its terms, the legislature has unrestricted choice; but no power can be derived by implication from any express power to enact laws as means for carrying it into execution unless such laws come within this description.

7. The making of notes or bills of credit a legal tender in payment of pre-existing debts is not a means appropriate, plainly adapted, or really calculated to carry into effect any express power vested in Congress, is inconsistent with the spirit of the Constitution, and is prohibited by the Constitution.

8. The clause in the acts of 1862 and 1863 which makes United States notes a legal tender in payment of all debts, public and private, is, so far as it applies to debts contracted before the passage of those acts, unwarranted by the Constitution.

9. Prior to the 25th of February, 1862, all contracts for the payment of money, not expressly stipulating otherwise, were, in legal effect and universal understanding, contracts for the payment of coin, and, under the Constitution, the parties to such contracts are respectively entitled to demand and bound to pay the sums due, according to their terms, in coin, notwithstanding the clause in that act, and the subsequent acts of like tenor, which make United States notes a legal tender in payment of such debts.

ERROR to the Court of Appeals of Kentucky, the case being this:

On the 20th of June, 1860, a certain Mrs. Hepburn made a promissory note, by which she promised to pay to Henry Griswold on the 20th of February, 1862, eleven thousand two hundred and fifty " dollars."

At the time when the note was made, as also at the time when it fell due, there was, confessedly, no lawful money of the United States, or money which could lawfully be tendered in payment of private debts, but gold and silver coin.

Five days after the day when the note by its terms fell due, that is to say, on the 25th of February, 1862, in an exigent crisis of the nation, in which the government was engaged in putting down an armed rebellion of vast magnitude, Congress passed an act authorizing the issue of $150,000,000

of its own notes,* and enacted in regard to them, by one clause in the first section of the act, as follows:

" And *such notes,* herein authorized, *shall be receivable in payment of all taxes, internal duties, excises, debts, and demands of every kind due to the United States,* except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin; *and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States,* except duties on imports and interest as aforesaid."

The note given by Mrs. Hepburn not being paid at maturity, interest accrued on it. And in March, 1864, suit having been brought on the note in the Louisville Chancery Court, she tendered in United States notes issued under the act mentioned, $12,720, the amount of principal of the note with the interest accrued to the date of tender, and some costs, in satisfaction of the plaintiff's claim. The tender was refused. The notes were then tendered and paid into court; and the chancellor, " resolving all doubts in favor of the Congress," declared the tender good and adjudged the debt, interest and costs to be satisfied accordingly.

The case was then taken by Griswold to the Court of Errors of Kentucky, which reversed the chancellor's judgment, and remanded the case with instructions to enter a contrary judgment.

From the judgment of the Court of Errors of Kentucky, the case was brought by Mrs. Hepburn here.

The cause was first argued at the Term of December, 1867, upon printed briefs submitted by Mr. Preston for the plaintiff in error, and Mr. Griswold *contra.* Subsequently, upon the suggestion of Mr. Stanbery, then Attorney-General, as to the great public importance of the question, the court ordered the cause and other causes involving, incidentally, the same question, to stand over to December Term, 1868, for reargument, with leave to the government to be heard. Accordingly, at that term the constitutionality of the provision in

---

* For the general form of the notes, see 7 Wallace, 26.

the act making the notes above-described a legal tender, was elaborately argued by *Mr. B. R. Curtis* (*counsel for the plaintiff in error, in* Willard v. Tayloe), *and by Mr. Evarts, Attorney-General, for the United States, in support of the provision, and by Mr. Clarkson N. Potter* (*of counsel for the defendant in error in this case*), *against the provision.*

And the constitutionality of the provision had been argued at different times, by other counsel, in five other cases, which it was supposed by their counsel might depend on it, but four of which were decided on other grounds; to wit, in support of the constitutionality by Mr. Carlisle, Mr. W. S. Cox, Mr. Williams, Mr. S. S. Rogers, Mr. B. R. Curtis, Mr. L. P. Poland, Mr. Howe, and against it by Mr. Bradley, Mr. Wilson, Mr. Johnson, Mr. John J. Townsend, Mr. McPherson, Mr. Wills, in *Thomson* v. *Riggs,** in *Lane County* v. *Oregon,*† in *Bronson* v. *Rodes,*‡ in *Willard* v. *Tayloe,*§ and in *Broderick* v. *Magraw.*‖ The question was therefore thoroughly argued. And it was held long under advisement.

It is deemed unnecessary here to present the arguments, already in part presented, in some of the cases named, the matter in the present case being fully argued on both sides, from the bench.

The CHIEF JUSTICE delivered the opinion of the court.

The question presented for our determination by the record in this case is, whether or not the payee or assignee of a note, made before the 25th of February, 1862, is obliged by law to accept in payment United States notes, equal in nominal amount to the sum due according to its terms, when tendered by the maker or other party bound to pay it? And this requires, in the first place, a construction of that clause of the first section of the act of Congress passed on that day, which declares the United States notes, the issue of which was authorized by the statute, to be a legal tender in payment of debts. The clause has already received much consideration here, and this court has held that, upon a sound con-

---

\* 5 Wallace, 663.          † 7 Id. 73.          ‡ Id. 229.
§ *Supra,* 557.          ‖ *Infra,* 639.

struction, neither taxes imposed by State legislation,* nor demands upon contracts which stipulate in terms for the payment or delivery of coin or bullion,† are included by legislative intention under the description of debts public and private. We are now to determine whether this description embraces debts contracted before as well as after the date of the act.

It is an established rule for the construction of statutes, that the terms employed by the legislature are not to receive an interpretation which conflicts with acknowledged principles of justice and equity, if another sense, consonant with those principles, can be given to them. But this rule cannot prevail where the intent is clear. Except in the scarcely supposable case where a statute sets at nought the plainest precepts of morality and social obligation, courts must give effect to the clearly ascertained legislative intent, if not repugnant to the fundamental law ordained in the Constitution.

Applying the rule just stated to the act under consideration, there appears to be strong reason for construing the word *debts* as having reference only to debts contracted subsequent to the enactment of the law. For no one will question that the United States notes, which the act makes a legal tender in payment, are essentially unlike in nature, and, being irredeemable in coin, are necessarily unlike in value, to the lawful money intended by parties to contracts for the payment of money made before its passage. The lawful money then in use and made a legal tender in payment, consisted of gold and silver coin. The currency in use under the act, and declared by its terms to be lawful money and a legal tender, consists of notes or promises to pay impressed upon paper, prepared in convenient form for circulation, and protected against counterfeiting by suitable devices and penalties. The former possess intrinsic value, determined by the weight and fineness of the metal; the latter have no intrinsic value, but a purchasing value, determined by the

---

* Lane County *v.* Oregon, 7 Wallace, 71.

† Bronson *v.* Rodes, 7 Id. 229; Butler *v.* Horwitz, Ib. 258.

quantity in circulation, by general consent to its currency in payments, and by opinion as to the probability of redemption in coin. Both derive, in different degrees, a certain additional value from their adaptation to circulation by the form and impress given to them under National authority, and from the acts making them respectively a legal tender.

Contracts for the payment of money, made before the act of 1862, had reference to coined money, and could not be discharged, unless by consent, otherwise than by tender of the sum due in coin. Every such contract, therefore, was, in legal import, a contract for the payment of coin.

There is a well-known law of currency, that notes or promises to pay, unless made conveniently and promptly convertible into coin at the will of the holder, can never, except under unusual and abnormal conditions, be at par in circulation with coin. It is an equally well-known law, that depreciation of notes must increase with the increase of the quantity put in circulation and the diminution of confidence in the ability or disposition to redeem. Their appreciation follows the reversal of these conditions. No act making them a legal tender can change materially the operation of these laws. Their force has been strikingly exemplified in the history of the United States notes. Beginning with a very slight depreciation when first issued, in March, 1862, they sank in July, 1864, to the rate of two dollars and eighty-five cents for a dollar in gold, and then rose until recently a dollar and twenty cents in paper became equal to a gold dollar.

Admitting, then, that prior contracts are within the intention of the act, and assuming that the act is warranted by the Constitution, it follows that the holder of a promissory note, made before the act, for a thousand dollars, payable, as we have just seen, according to the law and according to the intent of the parties, in coin, was required, when depreciation reached its lowest point, to accept in payment a thousand note dollars, although with the thousand coin dollars, due under the contract, he could have purchased on that day two thousand eight hundred and fifty such dollars.

Every payment, since the passage of the act, of a note of earlier date, has presented similar, though less striking features.

Now, it certainly needs no argument to prove that an act, compelling acceptance in satisfaction of any other than stipulated payment, alters arbitrarily the terms of the contract and impairs its obligation, and that the extent of impairment is in the proportion of the inequality of the payment accepted under the constraint of the law to the payment due under the contract. Nor does it need argument to prove that the practical operation of such an act is contrary to justice and equity. It follows that no construction which attributes such practical operation to an act of Congress is to be favored, or indeed to be admitted, if any other can be reconciled with the manifest intent of the legislature.

What, then, is that manifest intent? Are we at liberty, upon a fair and reasonable construction of the act, to say that Congress meant that the word "debts" used in the act should not include debts contracted prior to its passage?

In the case of *Bronson* v. *Rodes*, we thought ourselves warranted in holding that this word, as used in the statute, does not include obligations created by express contracts for the payment of gold and silver, whether coined or in bullion. This conclusion rested, however, mainly on the terms of the act, which not only allow, but require payments in coin by or to the government, and may be fairly considered, independently of considerations belonging to the law of contracts for the delivery of specified articles, as sanctioning special private contracts for like payments; without which, indeed, the provisions relating to government payments could hardly have practical effect. This consideration, however, does not apply to the matter now before us. There is nothing in the terms of the act which looks to any difference in its operation on different descriptions of debts payable generally in money—that is to say, in dollars and parts of a dollar. These terms, on the contrary, in their obvious import, include equally all debts not specially expressed to be payable in gold or silver, whether arising under past

contracts and already due, or arising under such contracts and to become due at a future day, or arising and becoming due under subsequent contracts. A strict and literal construction indeed would, as suggested by Mr. Justice Story,* in respect to the same word used in the Constitution, limit the word "debts" to *debts existing;* and if this construction cannot be accepted because the limitation sanctioned by it cannot be reconciled with the obvious scope and purpose of the act, it is certainly conclusive against any interpretation which will exclude existing debts from its operation. The same conclusion results from the exception of interest on loans and duties on imports from the effect of the legal tender clause. This exception affords an irresistible implication that no description of debts, whenever contracted, can be withdrawn from the effect of the act if not included within the terms or the reasonable intent of the exception. And it is worthy of observation in this connection, that in all the debates to which the act gave occasion in Congress, no suggestion was ever made that the legal tender clause did not apply as fully to contracts made before as to contracts made after its passage.

These considerations seem to us conclusive. We do not think ourselves at liberty, therefore, to say that Congress did not intend to make the notes authorized by it a legal tender in payment of debts contracted before the passage of the act.

We are thus brought to the question, whether Congress has power to make notes issued under its authority a legal tender in payment of debts, which, when contracted, were payable by law in gold and silver coin.

The delicacy and importance of this question has not been overstated in the argument. This court always approaches the consideration of questions of this nature reluctantly; and its constant rule of decision has been, and is, that acts of Congress must be regarded as constitutional, unless clearly shown to be otherwise.

---

* 1 Story on the Constitution, § 921.

But the Constitution is the fundamental law of the United States. By it the people have created a government, defined its powers, prescribed their limits, distributed them among the different departments, and directed, in general, the manner of their exercise. No department of the government has any other powers than those thus delegated to it by the people. All the legislative power granted by the Constitution belongs to Congress; but it has no legislative power which is not thus granted. And the same observation is equally true in its application to the executive and judicial powers granted respectively to the President and the courts. All these powers differ in kind, but not in source or in limitation. They all arise from the Constitution, and are limited by its terms.

It is the function of the judiciary to interpret and apply the law to cases between parties as they arise for judgment. It can only declare what the law is, and enforce, by proper process, the law thus declared. But, in ascertaining the respective rights of parties, it frequently becomes necessary to consult the Constitution. For there can be no law inconsistent with the fundamental law. No enactment not in pursuance of the authority conferred by it can create obligations or confer rights. For such is the express declaration of the Constitution itself in these words:

"The Constitution, and the laws of the United States which shall be *made in pursuance thereof*, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges of every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

Not every act of Congress, then, is to be regarded as the supreme law of the land; nor is it by every act of Congress that the judges are bound. This character and this force belong only to such acts as are "made in pursuance of the Constitution."

When, therefore, a case arises for judicial determination, and the decision depends on the alleged inconsistency of a

legislative provision with the fundamental law, it is the plain duty of the court to compare the act with the Constitution, and if the former cannot, upon a fair construction, be reconciled with the latter, to give effect to the Constitution rather than the statute. This seems so plain that it is impossible to make it plainer by argument. If it be otherwise the Constitution is not the supreme law; it is neither necessary or useful, in any case, to inquire whether or not any act of Congress was passed in pursuance of it; and the oath which every member of this court is required to take, that he " will administer justice without respect to persons, and do equal right to the poor and the rich, and faithfully perform the duties incumbent upon him to the best of his ability and understanding, agreeably to the Constitution and laws of the United States," becomes an idle and unmeaning form.

The case before us is one of private right. The plaintiff in the court below sought to recover of the defendants a certain sum expressed on the face of a promissory note. The defendants insisted on the right, under the act of February 25th, 1862, to acquit themselves of their obligation by tendering in payment a sum nominally equal in United States notes. But the note had been executed before the passage of the act, and the plaintiff insisted on his right under the Constitution to be paid the amount due in gold and silver. And it has not been, and cannot be, denied that the plaintiff was entitled to judgment according to his claim, unless bound by a constitutional law to accept the notes as coin.

Thus two questions were directly presented: Were the defendants relieved by the act from the obligation assumed in the contract? Could the plaintiff be compelled, by a judgment of the court, to receive in payment a currency of different nature and value from that which was in the contemplation of the parties when the contract was made?

The Court of Appeals resolved both questions in the negative, and the defendants, in the original suit, seek the reversal of that judgment by writ of error.

It becomes our duty, therefore, to determine whether the act of February 25th, 1862, so far as it makes United States notes a legal tender in payment of debts contracted prior to its passage, is constitutional and valid or otherwise. Under a deep sense of our obligation to perform this duty to the best of our ability and understanding, we shall proceed to dispose of the case presented by the record.

We have already said, and it is generally, if not universally, conceded, that the government of the United States is one of limited powers, and that no department possesses any authority not granted by the Constitution.

It is not necessary, however, in order to prove the existence of a particular authority to show a particular and express grant. The design of the Constitution was to establish a government competent to the direction and administration of the affairs of a great nation, and, at the same time, to mark, by sufficiently definite lines, the sphere of its operations. To this end it was needful only to make express grants of general powers, coupled with a further grant of such incidental and auxiliary powers as might be required for the exercise of the powers expressly granted. These powers are necessarily extensive. It has been found, indeed, in the practical administration of the government, that a very large part, if not the largest part, of its functions have been performed in the exercise of powers thus implied.

But the extension of power by implication was regarded with some apprehension by the wise men who framed, and by the intelligent citizens who adopted, the Constitution. This apprehension is manifest in the terms by which the grant of incidental and auxiliary powers is made. All powers of this nature are included under the description of " power to make all laws necessary and proper for carrying into execution the powers expressly granted to Congress or vested by the Constitution in the government or in any of its departments or officers."

The same apprehension is equally apparent in the tenth article of the amendments, which declares that " the powers not delegated to the United States by the Constitution, nor

prohibited by it to the States, are reserved to the States or the people."

We do not mean to say that either of these constitutional provisions is to be taken as restricting any exercise of power fairly warranted by legitimate derivation from one of the enumerated or express powers. The first was undoubtedly introduced to exclude all doubt in respect to the existence of implied powers; while the words "necessary and proper" were intended to have a "sense," to use the words of Mr. Justice Story, "at once admonitory and directory," and to require that the means used in the execution of an express power "should be *bonâ fide,* appropriate to the end."* The second provision was intended to have a like admonitory and directory sense, and to restrain the limited government established under the Constitution from the exercise of powers not clearly delegated or derived by just inference from powers so delegated.

It has not been maintained in argument, nor, indeed, would any one, however slightly conversant with constitutional law, think of maintaining that there is in the Constitution any express grant of legislative power to make any description of credit currency a legal tender in payment of debts.

We must inquire then whether this can be done in the exercise of an implied power.

The rule for determining whether a legislative enactment can be supported as an exercise of an implied power was stated by Chief Justice Marshall, speaking for the whole court, in the case of *McCullough* v. *The State of Maryland;*† and the statement then made has ever since been accepted as a correct exposition of the Constitution. His words were these: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." And in another part of the

---

* 2 Story on the Constitution, p. 142, § 1253.          † 4 Wheaton, 421.

same opinion the practical application of this rule was thus illustrated: "Should Congress, in the execution of its powers, adopt measures which are prohibited by the Constitution, or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would be the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land. But where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and tread on legislative ground."*

It must be taken then as finally settled, so far as judicial decisions can settle anything, that the words "all laws necessary and proper for carrying into execution" powers expressly granted or vested, have, in the Constitution, a sense equivalent to that of the words, laws, not absolutely necessary indeed, but appropriate, plainly adapted to constitutional and legitimate ends; laws not prohibited, but consistent with the letter and spirit of the Constitution; laws really calculated to effect objects intrusted to the government.

The question before us, then, resolves itself into this: "Is the clause which makes United States notes a legal tender for debts contracted prior to its enactment, a law of the description stated in the rule?"

It is not doubted that the power to establish a standard of value by which all other values may be measured, or, in other words, to determine what shall be lawful money and a legal tender, is in its nature, and of necessity, a governmental power. It is in all countries exercised by the government. In the United States, so far as it relates to the precious metals, it is vested in Congress by the grant of the power to coin money. But can a power to impart these qualities to notes, or promises to pay money, when offered in discharge of pre-

---

* 4 Wheaton, 423.

existing debts, be derived from the coinage power, or from any other power expressly given?

It is certainly not the same power as the power to coin money. Nor is it in any reasonable or satisfactory sense an appropriate or plainly adapted means to the exercise of that power. Nor is there more reason for saying that it is implied in, or incidental to, the power to regulate the value of coined money of the United States, or of foreign coins. This power of regulation is a power to determine the weight, purity, form, impression, and denomination of the several coins, and their relation to each other, and the relations of foreign coins to the monetary unit of the United States.

Nor is the power to make notes a legal tender the same as the power to issue notes to be used as currency. The old Congress, under the Articles of Confederation, was clothed by express grant with the power to emit bills of credit, which are in fact notes for circulation as currency; and yet that Congress was not clothed with the power to make these bills a legal tender in payment. And this court has recently held that the Congress, under the Constitution, possesses, as incidental to other powers, the same power as the old Congress to emit bills or notes; but it was expressly declared at the same time that this decision concluded nothing on the question of legal tender. Indeed, we are not aware that it has ever been claimed that the power to issue bills or notes has any identity with the power to make them a legal tender. On the contrary, the whole history of the country refutes that notion. The States have always been held to possess the power to authorize and regulate the issue of bills for circulation by banks or individuals, subject, as has been lately determined, to the control of Congress, for the purpose of establishing and securing a National currency; and yet the States are expressly prohibited by the Constitution from making anything but gold and silver coin a legal tender. This seems decisive on the point that the power to issue notes and the power to make them a legal tender are not the same power, and that they have no necessary connection with each other.

But it has been maintained in argument that the power to

make United States notes a legal tender in payment of all debts is a means appropriate and plainly adapted to the execution of the power to carry on war, of the power to regulate commerce, and of the power to borrow money. If it is, and is not prohibited, nor inconsistent with the letter or spirit of the Constitution, then the act which makes them such legal tender must be held to be constitutional.

Let us, then, first inquire whether it is an appropriate and plainly adapted means for carrying on war? The affirmative argument may be thus stated: Congress has power to declare and provide for carrying on war; Congress has also power to emit bills of credit, or circulating notes receivable for government dues and payable, so far at least as parties are willing to receive them, in discharge of government obligations; it will facilitate the use of such notes in disbursements to make them a legal tender in payment of existing debts; therefore Congress may make such notes a legal tender.

It is difficult to say to what express power the authority to make notes a legal tender in payment of pre-existing debts may not be upheld as incidental, upon the principles of this argument. Is there any power which does not involve the use of money? And is there any doubt that Congress may issue and use bills of credit as money in the execution of any power? The power to establish post-offices and post-roads, for example, involves the collection and disbursement of a great revenue. Is not the power to make notes a legal tender as clearly incidental to this power as to the war power?

The answer to this question does not appear to us doubtful. The argument, therefore, seems to prove too much. It carries the doctrine of implied powers very far beyond any extent hitherto given to it. It asserts that whatever in any degree promotes an end within the scope of a general power, whether, in the correct sense of the word, appropriate or not, may be done in the exercise of an implied power.

Can this proposition be maintained?

It is said that this is not a question for the court deciding a cause, but for Congress exercising the power. But the decisive answer to this is that the admission of a legislative

power to determine finally what powers have the described relation as means to the execution of other powers plainly granted, and, then, to exercise absolutely and without liability to question, in cases involving private rights, the powers thus determined to have that relation, would completely change the nature of American government. It would convert the government, which the people ordained as a government of limited powers, into a government of unlimited powers. It would confuse the boundaries which separate the executive and judicial from the legislative authority. It would obliterate every criterion which this court, speaking through the venerated Chief Justice in the case already cited, established for the determination of the question whether legislative acts are constitutional or unconstitutional.

Undoubtedly among means appropriate, plainly adapted, really calculated, the legislature has unrestricted choice. But there can be no implied power to use means not within the description.

Now, then, let it be considered what has actually been done in the provision of a National currency. In July and August, 1861, and February, 1862, the issue of sixty millions of dollars in United States notes, payable on demand, was authorized.* They were made receivable in payments, but were not declared a legal tender until March, 1862,† when the amount in circulation had been greatly reduced by receipt and cancellation. In 1862 and 1863‡ the issue of four hundred and fifty millions in United States notes, payable not on demand, but, in effect, at the convenience of the government, was authorized, subject to certain restrictions as to fifty millions. These notes were made receivable for the bonds of the National loans, for all debts due to or from the United States, except duties on imports and interest on the public debt, and were also declared a legal tender. In March, 1863,§ the issue of notes for parts of a dollar was authorized to an amount not exceeding fifty millions of dollars. These notes were not declared a legal tender, but were

---

\* 12 Stat. at Large, 259, 313, and 338.      † Ib. 370.
‡ Ib. 345, 532, and 709.      § Ib. 711.

made redeemable under regulations to be prescribed by the Secretary of the Treasury.   In February, 1863,* the issue of three hundred millions of dollars in notes of the National banking associations was authorized.   These notes were made receivable to the same extent as United States notes, and provision was made to secure their redemption, but they were not made a legal tender.

The several descriptions of notes have since constituted, under the various acts of Congress, the common currency of the United States.   The notes which were not declared a legal tender have circulated with those which were so declared without unfavorable discrimination.

It may be added as a part of the history that other issues, bearing interest at various rates, were authorized and made a legal tender, except in redemption of bank notes, for face amount exclusive of interest.   Such were the one and two years five per cent. notes and three years compound interest notes.†   These notes never entered largely or permanently into the circulation; and there is no reason to think that their utility was increased or diminished by the act which declared them a legal tender for face amount.   They need not be further considered here.   They serve only to illustrate the tendency remarked by all who have investigated the subject of paper money, to increase the volume of irredeemable issues, and to extend indefinitely the application of the quality of legal tender.   That it was carried no farther during the recent civil war, and has been carried no farther since, is due to circumstances, the consideration of which does not belong to this discussion.

We recur, then, to the question under consideration.   No one questions the general constitutionality, and not very many, perhaps, the general expediency of the legislation by which a note currency has been authorized in recent years. The doubt is as to the power to declare a particular class of these notes to be a legal tender in payment of pre-existing debts.

---

* 12 Stat. at Large, 669.                    † 13 Id. 218, 425.

The only ground upon which this power is asserted is, not that the issue of notes was an appropriate and plainly adapted means for carrying on the war, for that is admitted; but that the making of them a legal tender to the extent mentioned was such a means.

Now, we have seen that of all the notes issued those not declared a legal tender at all constituted a very large proportion, and that they circulated freely and without discount.

It may be said that their equality in circulation and credit was due to the provision made by law for the redemption of this paper in legal tender notes. But this provision, if at all useful in this respect, was of trifling importance compared with that which made them receivable for government dues. All modern history testifies that, in time of war especially, when taxes are augmented, large loans negotiated, and heavy disbursements made, notes issued by the authority of the government, and made receivable for dues of the government, always obtain at first a ready circulation; and even when not redeemable in coin, on demand, are as little and usually less subject to depreciation than any other description of notes, for the redemption of which no better provision is made. And the history of the legislation under consideration is, that it was upon this quality of receivability, and not upon the quality of legal tender, that reliance for circulation was originally placed; for the receivability clause appears to have been in the original draft of the bill, while the legal tender clause seems to have been introduced at a later stage of its progress.

These facts certainly are not without weight as evidence that all the useful purposes of the notes would have been fully answered without making them a legal tender for pre-existing debts. It is denied, indeed, by eminent writers, that the quality of legal tender adds anything at all to the credit or usefulness of government notes. They insist, on the contrary, that it impairs both. However this may be, it must be remembered that it is as a means to an end to be attained by the action of the government, that the implied

power of making notes a legal tender in all payments is claimed under the Constitution. Now, how far is the government helped by this means? Certainly it cannot obtain new supplies or services at a cheaper rate, for no one will take the notes for more than they are worth at the time of the new contract. The price will rise in the ratio of the depreciation, and this is all that could happen if the notes were not made a legal tender. But it may be said that the depreciation will be less to him who takes them from the government, if the government will pledge to him its power to compel his creditors to receive them at par in payments. This is, as we have seen, by no means certain. If the quantity issued be excessive, and redemption uncertain and remote, great depreciation will take place; if, on the other hand, the quantity is only adequate to the demands of business, and confidence in early redemption is strong, the notes will circulate freely, whether made a legal tender or not.

But if it be admitted that some increase of availability is derived from making the notes a legal tender under new contracts, it by no means follows that any appreciable advantage is gained by compelling creditors to receive them in satisfaction of pre-existing debts. And there is abundant evidence, that whatever benefit is possible from that compulsion to some individuals or to the government, is far more than outweighed by the losses of property, the derangement of business, the fluctuations of currency and values, and the increase of prices to the people and the government, and the long train of evils which flow from the use of irredeemable paper money. It is true that these evils are not to be attributed altogether to making it a legal tender. But this increases these evils. It certainly widens their extent and protracts their continuance.

We are unable to persuade ourselves that an expedient of this sort is an appropriate and plainly adapted means for the execution of the power to declare and carry on war. If it adds nothing to the utility of the notes, it cannot be upheld as a means to the end in furtherance of which the notes are issued. Nor can it, in our judgment, be upheld as such, if,

while facilitating in some degree the circulation of the notes, it debases and injures the currency in its proper use to a much greater degree. And these considerations seem to us equally applicable to the powers to regulate commerce and to borrow money. Both powers necessarily involve the use of money by the people and by the government, but neither, as we think, carries with it as an appropriate and plainly adapted means to its exercise, the power of making circulating notes a legal tender in payment of pre-existing debts.

But there is another view, which seems to us decisive, to whatever express power the supposed implied power in question may be referred. In the rule stated by Chief Justice Marshall, the words appropriate, plainly adapted, really calculated, are qualified by the limitation that the means must be not prohibited, but consistent with the letter and spirit of the Constitution. Nothing so prohibited or inconsistent can be regarded as appropriate, or plainly adapted, or really calculated means to any end.

Let us inquire, then, first, whether making bills of credit a legal tender, to the extent indicated, is consistent with the spirit of the Constitution.

Among the great cardinal principles of that instrument, no one is more conspicuous or more venerable than the establishment of justice. And what was intended by the establishment of justice in the minds of the people who ordained it is, happily, not a matter of disputation. It is not left to inference or conjecture, especially in its relations to contracts.

When the Constitution was undergoing discussion in the Convention, the Congress of the Confederation was engaged in the consideration of the ordinance for the government of the territory northwest of the Ohio, the only territory subject at that time to its regulation and control. By this ordinance certain fundamental articles of compact were established between the original States and the people and States of the territory, for the purpose, to use its own language, " of extending the fundamental principles of civil and religious liberty, whereon these republics" (the States united under the Confederation), "their laws, and constitutions are erected."

Among these fundamental principles was this: "And in the just preservation of rights and property it is understood and declared that no law ought ever to be made, or have force in the said territory, that shall in any manner whatever interfere with or affect private contracts or engagements *bonâ fide* and without fraud previously formed."

The same principle found more condensed expression in that most valuable provision of the Constitution of the United States, ever recognized as an efficient safeguard against injustice, that "no State shall pass any law impairing the obligation of contracts."

It is true that this prohibition is not applied in terms to the government of the United States. Congress has express power to enact bankrupt laws, and we do not say that a law made in the execution of any other express power, which, incidentally only, impairs the obligation of a contract, can be held to be unconstitutional for that reason.

But we think it clear that those who framed and those who adopted the Constitution, intended that the spirit of this prohibition should pervade the entire body of legislation, and that the justice which the Constitution was ordained to establish was not thought by them to be compatible with legislation of an opposite tendency. In other words, we cannot doubt that a law not made in pursuance of an express power, which necessarily and in its direct operation impairs the obligation of contracts, is inconsistent with the spirit of the Constitution.

Another provision, found in the fifth amendment, must be considered in this connection. We refer to that which ordains that private property shall not be taken for public use without compensation. This provision is kindred in spirit to that which forbids legislation impairing the obligation of contracts; but, unlike that, it is addressed directly and solely to the National government. It does not, in terms, prohibit legislation which appropriates the private property of one class of citizens to the use of another class; but if such property cannot be taken for the benefit of all, without compensation, it is difficult to understand how it can be so

taken for the benefit of a part without violating the spirit of the prohibition.

But there is another provision in the same amendment, which, in our judgment, cannot have its full and intended effect unless construed as a direct prohibition of the legislation which we have been considering. It is that which declares that " no person shall be deprived of life, liberty, or property, without due process of law."

It is not doubted that all the provisions of this amendment operate directly in limitation and restraint of the legislative powers conferred by the Constitution. The only question is, whether an act which compels all those who hold contracts for the payment of gold and silver money to accept in payment a currency of inferior value deprives such persons of property without due process of law.

It is quite clear, that whatever may be the operation of such an act, due process of law makes no part of it. Does it deprive any person of property? A very large proportion of the property of civilized men exists in the form of contracts. These contracts almost invariably stipulate for the payment of money. And we have already seen that contracts in the United States, prior to the act under consideration, for the payment of money, were contracts to pay the sums specified in gold and silver coin. And it is beyond doubt that the holders of these contracts were and are as fully entitled to the protection of this constitutional provision as the holders of any other description of property.

But it may be said that the holders of no description of property are protected by it from legislation which incidentally only impairs its value. And it may be urged in illustration that the holders of stock in a turnpike, a bridge, or a manufacturing corporation, or an insurance company, or a bank, cannot invoke its protection against legislation which, by authorizing similar works or corporations, reduces its price in the market. But all this does not appear to meet the real difficulty. In the cases mentioned the injury is purely contingent and incidental. In the case we are considering it is direct and inevitable.

If in the cases mentioned the holders of the stock were required by law to convey it on demand to any one who should think fit to offer half its value for it, the analogy would be more obvious. No one probably could be found to contend that an act enforcing the acceptance of fifty or seventy-five acres of land in satisfaction of a contract to convey a hundred would not come within the prohibition against arbitrary privation of property.

We confess ourselves unable to perceive any solid distinction between such an act and an act compelling all citizens to accept, in satisfaction of all contracts for money, half or three-quarters or any other proportion less than the whole of the value actually due, according to their terms. It is difficult to conceive what act would take private property without process of law if such an act would not.

We are obliged to conclude that an act making mere promises to pay dollars a legal tender in payment of debts previously contracted, is not a means appropriate, plainly adapted, really calculated to carry into effect any express power vested in Congress; that such an act is inconsistent with the spirit of the Constitution; and that it is prohibited by the Constitution.

It is not surprising that amid the tumult of the late civil war, and under the influence of apprehensions for the safety of the Republic almost universal, different views, never before entertained by American statesmen or jurists, were adopted by many. The time was not favorable to considerate reflection upon the constitutional limits of legislative or executive authority. If power was assumed from patriotic motives, the assumption found ready justification in patriotic hearts. Many who doubted yielded their doubts; many who did not doubt were silent. Some who were strongly averse to making government notes a legal tender felt themselves constrained to acquiesce in the views of the advocates of the measure. Not a few who then insisted upon its necessity, or acquiesced in that view, have, since the return of peace, and under the influence of the calmer time, reconsidered their conclusions,

and now concur in those which we have just announced. These conclusions seem to us to be fully sanctioned by the letter and spirit of the Constitution.

We are obliged, therefore, to hold that the defendant in error was not bound to receive from the plaintiffs the currency tendered to him in payment of their note, made before the passage of the act of February 25th, 1862. It follows that the judgment of the Court of Appeals of Kentucky must be affirmed.

It is proper to say that Mr. Justice Grier, who was a member of the court when this cause was decided in conference,[*] and when this opinion was directed to be read,[†] stated his judgment to be that the legal tender clause, properly construed, has no application to debts contracted prior to its enactment; but that upon the construction given to the act by the other judges he concurred in the opinion that the clause, so far as it makes United States notes a legal tender for such debts, is not warranted by the Constitution.

JUDGMENT AFFIRMED.

Mr. Justice MILLER (with whom concurred SWAYNE and DAVIS, JJ.), dissenting.

The provisions of the Constitution of the United States which have direct reference to the function of legislation may be divided into three primary classes:

1. Those which confer legislative powers on Congress.

2. Those which prohibit the exercise of legislative powers by Congress.

3. Those which prohibit the States from exercising certain legislative powers.

The powers conferred on Congress may be subdivided into the positive and the auxiliary, or, as they are more commonly called, the express and the implied powers.

As instances of the former class may be mentioned the power to borrow money, to raise and support armies, and to coin money and regulate the value thereof.

---

[*] November 27th, 1869.      [†] January 29th, 1870.

The implied or auxiliary powers of legislation are founded largely on that general provision which closes the enumeration of powers granted in express terms, by the declaration that Congress shall also " have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

The question which this court is called upon to consider, is whether the authority to make the notes of the United States a lawful tender in payment of debts, is to be found in Congress under either of these classes of legislative powers.

As one of the elements of this question, and in order to negative any idea that the exercise of such a power would be an invasion of the rights reserved to the States, it may be as well to say at the outset, that this is among the subjects of legislation forbidden to the States by the Constitution. Among the unequivocal utterances of that instrument on this subject of legal tender, is that which declares that " no State shall coin money, emit bills of credit, or make anything but gold and silver coin a tender in payment of debts;" thus removing the whole matter from the domain of State legislation.

No such prohibition is placed upon the power of Congress on this subject, though there are, as I have already said, matters expressly forbidden to Congress; but neither this of legal tender, nor of the power to emit bills of credit, or to impair the obligation of contracts, is among them. On the contrary, Congress is expressly authorized to coin money and to regulate the value thereof, and of foreign coins, and to punish the counterfeiting of such coin and of the securities of the United States. It has been strongly argued by many able jurists that these latter clauses, fairly construed, confer the power to make the securities of the United States a lawful tender in payment of debts.

While I am not able to see in them standing alone a sufficient warrant for the exercise of this power, they are not without decided weight when we come to consider the ques-

tion of the existence of this power, as one necessary and proper for carrying into execution other admitted powers of the government. For they show that so far as the framers of the Constitution did go in granting *express* power over the lawful money of the country, it was confided to Congress and forbidden to the States; and it is no unreasonable inference, that if it should be found necessary in carrying into effect some of the powers of the government essential to its successful operation, to make its securities perform the office of money in the payment of debts, such legislation would be in harmony with the power over money granted in express terms.

It being conceded, then, that the power under consideration would not, if exercised by Congress, be an invasion of any right reserved to the States, but one which they are forbidden to employ, and that it is not one in terms either granted or denied to Congress, can it be sustained as a law necessary and proper, at the time it was enacted, for carrying into execution any of these powers that are expressly granted either to Congress, or to the government, or to any department thereof?

From the organization of the government under the present Constitution, there have been from time to time attempts to limit the powers granted by that instrument, by a narrow and literal rule of construction, and these have been specially directed to the general clause which we have cited as the foundation of the auxiliary powers of the government. It has been said that this clause, so far from authorizing the use of any means which could not have been used without it, is a restriction upon the powers necessarily implied by an instrument so general in its language.

The doctrine is, that when an act of Congress is brought to the test of this clause of the Constitution, its necessity must be absolute, and its adaptation to the conceded purpose unquestionable.

Nowhere has this principle been met with more emphatic denial, and more satisfactory refutation, than in this court. That eminent jurist and statesman, whose official career of

over thirty years as Chief Justice commenced very soon after the Constitution was adopted, and whose opinions have done as much to fix its meaning as those of any man living or dead, has given this particular clause the benefit of his fullest consideration.

In the case of *The United States* v. *Fisher*,* decided in 1804, the point in issue was the priority claimed for the United States as a creditor of a bankrupt over all other creditors. It was argued mainly on the construction of the statutes; but the power of Congress to pass such a law was also denied. Chief Justice Marshall said: " It is claimed under the authority to make all laws which shall be necessary and proper to carry into execution the powers vested by the Constitution in the government, or in any department thereof. In construing this clause, it would be incorrect, and would produce endless difficulties, if the opinion should be maintained, that no law was authorized which was not indispensably necessary to give effect to a specified power. Where various systems might be adopted for that purpose, it might be said with respect to each that it was not necessary, because the end might be attained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of the power granted by the Constitution."

It was accordingly held that, under the authority to pay the debts of the Union, it could pass a law giving priority for its own debts in cases of bankruptcy.

But in the memorable case of *McCulloch* v. *The State of Maryland*,† the most exhaustive discussion of this clause is found in the opinion of the court by the same eminent expounder of the Constitution. That case involved, it is well known, the right of Congress to establish the Bank of the United States, and to authorize it to issue notes for circulation. It was conceded that the right to incorporate or create such a bank had no specific grant in any clause of the Constitution, still less the right to authorize it to issue notes for

---

\* 2 Cranch, 358.                         † 4 Wheaton, 316.

circulation as money. But it was argued, that as a means necessary to enable the government to collect, transfer, and pay out its revenues, the organization of a bank with this function was within the power of Congress. In speaking of the true meaning of the word " necessary" in this clause of the Constitution, he says: " Does it always import an absolute physical necessity so strong, that one thing to which another may be termed necessary cannot exist without it? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient or useful, or essential to another. To employ means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable."

The word necessary admits, he says, of all degrees of comparison. "A thing may be necessary, very necessary, absolutely or indispensably necessary. . . . This word, then, like others, is used in various senses, and in its construction the subject, the context, the intention of the person using them are all to be taken into view. Let this be done in the case under consideration. The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers to insure, as far as human prudence could insure, their beneficial execution. This could not be done by confining the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a Constitution intended to endure for ages to come, and consequently to be adapted to various crises of human affairs. To have prescribed the means by which the government should in all future time execute its powers, would have been to change entirely the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide by immutable rules for exigencies which, if foreseen at

all, must have been but dimly, and which can best be provided for as they occur. To have declared that the best means shall not be used but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances."

I have cited at unusual length these remarks of Chief Justice Marshall, because though made half a century ago, their applicability to the circumstances under which Congress called to its aid the power of making the securities of the government a legal tender, as a means of successfully prosecuting a war, which without such aid seemed likely to terminate its existence, and to borrow money which could in no other manner be borrowed, and to pay the debt of millions due to its soldiers in the field, which could by no other means be paid, seems to be almost prophetic. If he had had clearly before his mind the future history of his country, he could not have better characterized a principle which would in this very case have rendered the power to carry on war nugatory, which would have deprived Congress of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances, by the use of the most appropriate means of supporting the government in the crisis of its fate.

But it is said that the clause under consideration is admonitory as to the use of implied powers, and adds nothing to what would have been authorized without it.

The idea is not new, and is probably intended for the same which was urged in the case of _McCulloch_ v. _The State of Maryland_, namely, that instead of enlarging the powers conferred on Congress, or providing for a more liberal use of them, it was designed as a restriction upon the ancillary powers incidental to every express grant of power in general terms. I have already cited so fully from that case, that I can only refer to it to say that this proposition is there clearly stated and refuted.

Does there exist, then, any power in Congress or in the

government, by express grant, in the execution of which this legal tender act was necessary and proper, in the sense here defined, and under the circumstances of its passage?

The power to declare war, to suppress insurrection, to raise and support armies, to provide and maintain a navy, to borrow money on the credit of the United States, to pay the debts of the Union, and to provide for the common defence and general welfare, are each and all distinctly and specifically granted in separate clauses of the Constitution.

We were in the midst of a war which called all these powers into exercise and taxed them severely. A war which, if we take into account the increased capacity for destruction introduced by modern science, and the corresponding increase of its cost, brought into operation powers of belligerency more potent and more expensive than any that the world has ever known.

All the ordinary means of rendering efficient the several powers of Congress above-mentioned had been employed to their utmost capacity, and with the spirit of the rebellion unbroken, with large armies in the field unpaid, with a current expenditure of over a million of dollars per day, the credit of the government nearly exhausted, and the resources of taxation inadequate to pay even the interest on the public debt, Congress was called on to devise some new means of borrowing money on the credit of the nation; for the result of the war was conceded by all thoughtful men to depend on the capacity of the government to raise money in amounts previously unknown. The banks had already loaned their means to the treasury. They had been compelled to suspend the payment of specie on their own notes. The coin in the country, if it could all have been placed within the control of the Secretary of the Treasury, would not have made a circulation sufficient to answer army purchases and army payments, to say nothing of the ordinary business of the country. A general collapse of credit, of payment, and of business seemed inevitable, in which faith in the ability of the government would have been destroyed, the rebellion would have triumphed, the States would have

been left divided, and the people impoverished. The National government would have perished, and, with it, the Constitution which we are now called upon to construe with such nice and critical accuracy.

That the legal tender act prevented these disastrous results, and that the tender clause was necessary to prevent them, I entertain no doubt.

It furnished instantly a means of paying the soldiers in the field, and filled the coffers of the commissary and quartermaster. It furnished a medium for the payment of private debts, as well as public, at a time when gold was being rapidly withdrawn from circulation, and the State bank currency was becoming worthless. It furnished the means to the capitalist of buying the bonds of the government. It stimulated trade, revived the drooping energies of the country, and restored confidence to the public mind.

The results which followed the adoption of this measure are beyond dispute. No other adequate cause has ever been assigned for the revival of government credit, the renewed activity of trade, and the facility with which the government borrowed, in two or three years, at reasonable rates of interest, mainly from its own citizens, double the amount of money there was in the country, including coin, bank notes, and the notes issued under the legal tender acts.

It is now said, however, in the calm retrospect of these events, that treasury notes suitable for circulation as money, bearing on their face the pledge of the United States for their ultimate payment in coin, would, if not equally efficient, have answered the requirement of the occasion without being made a lawful tender for debts.

. But what was needed was something more than the credit of the government. That had been stretched to its utmost tension, and was clearly no longer sufficient in the simple form of borrowing money. Is there any reason to believe that the mere change in the form of the security given would have revived this sinking credit? On the contrary, all experience shows that a currency not redeemable promptly in coin, but dependent on the credit of a promissor whose re-

sources are rapidly diminishing, while his liabilities are increasing, soon sinks to the dead level of worthless paper. As no man would have been compelled to take it in payment of debts, as it bore no interest, as its period of redemption would have been remote and uncertain, this must have been the inevitable fate of any extensive issue of such notes.

But when by law they were made to discharge the function of paying debts, they had a perpetual credit or value, equal to the amount of all the debts, public and private, in the country. If they were never redeemed, as they never have been, they still paid debts at their par value, and for this purpose were then, and always have been, eagerly sought by the people. To say, then, that this quality of legal tender was not necessary to their usefulness, seems to be unsupported by any sound view of the situation.

Nor can any just inference of that proposition arise from a comparison of the legal tender notes with the bonds issued by the government about the same time. These bonds had a fixed period for their payment, and the Secretary of the Treasury declared that they were payable in gold. They bore interest, which was payable semi-annually in gold, by express terms on their face, and the customs duties, which by law could be paid in nothing but gold, were sacredly pledged to the payment of this interest. They can afford no means of determining what would have been the fate of treasury notes designed to circulate as money, but which bore no interest, and had no fixed time of redemption, and by law could pay no debts, and had no fund pledged for their payment.

The legal tender clauses of the statutes under consideration were placed emphatically by those who enacted them, upon their necessity to the further borrowing of money and maintaining the army and navy. It was done reluctantly and with hesitation, and only after the necessity had been demonstrated and had become imperative. Our statesmen had been trained in a school which looked upon such legislation with something more than distrust. The debates of the two houses of Congress show, that on this necessity alone could

this clause of the bill have been carried, and they also prove, as I think, very clearly the existence of that necessity. The history of that gloomy time, not to be readily forgotten by the lover of his country, will forever remain, the full, clear, and ample vindication of the exercise of this power by Congress, as its results have demonstrated the sagacity of those who originated and carried through this measure.

Certainly it seems to the best judgment that I can bring to bear upon the subject that this law was a necessity in the most stringent sense in which that word can be used. But if we adopt the construction of Chief Justice Marshall and the full court over which he presided, a construction which has never to this day been overruled or questioned in this court, how can we avoid this conclusion? Can it be said that this provision did not conduce towards the purpose of borrowing money, of paying debts, of raising armies, of suppressing insurrection? or that it was not calculated to effect these objects? or that it was not useful and essential to that end? Can it be said that this was not among the choice of means, if not the only means, which were left to Congress to carry on this war for national existence?

Let us compare the present with other cases decided in this court.

If we can say judicially that to declare, as in the case of *The United States* v. *Fisher*, that the debt which a bankrupt owes the government shall have priority of payment over all other debts, is a necessary and proper law to enable the government to pay its own debts, how can we say that the legal tender clause was not necessary and proper to enable the government to borrow money to carry on the war?

The creation of the United States Bank, and especially the power granted to it to issue notes for circulation as money, was strenuously resisted as without constitutional authority; but this court held that a bank of issue was necessary, in the sense of that word as used in the Constitution, to enable the government to collect, to transfer, and to pay out its revenues.

It was never claimed that the government could find no

other means to do this. It could not then be denied, nor has it ever been, that other means more clearly within the competency of Congress existed, nor that a bank of deposit might possibly have answered without a circulation. But because that was the most fitting, useful, and efficient mode of doing what Congress was authorized to do, it was held to be necessary by this court. The necessity in that case is much less apparent to me than in the adoption of the legal tender clause.

In the *Veazie Bank* v. *Fenno*, decided at the present term,* this court held, after full consideration, that it was the privilege of Congress to furnish to the country the currency to be used by it in the transaction of business, whether this was done by means of coin, of the notes of the United States, or of banks created by Congress. And that as a means of making this power of Congress efficient, that body could make this currency exclusive by taxing out of existence any currency authorized by the States. It was said "that having, in the exercise of undoubted constitutional power, undertaken to provide a currency for the whole country, it cannot be questioned that Congress may constitutionally secure the benefit of it to the people by appropriate means." Which is the more appropriate and effectual means of making the currency established by Congress useful, acceptable, perfect—the taxing of all other currency out of existence, or giving to that furnished by the government the quality of lawful tender for debts? The latter is a means directly conducive to the end to be attained, a means which attains the end more promptly and more perfectly than any other means can do. The former is a remote and uncertain means in its effect, and is liable to the serious objection that it interferes with State legislation. If Congress can, however, under its implied power, protect and foster this currency by such means as destructive taxation on State bank circulation, it seems strange, indeed, if it cannot adopt the more appropriate and the more effectual means of declaring these notes

* * *Supra,* 533.*

of its own issue, for the redemption of which its faith is pledged, a lawful tender-in payment of debts.

But it is said that the law is in conflict with the spirit, if not the letter, of several provisions of the Constitution. Undoubtedly it is a law impairing the obligation of contracts made before its passage. But while the Constitution forbids the States to pass such laws it does not forbid Congress. On the contrary, Congress is expressly authorized to establish a uniform system of bankruptcy, the essence of which is to discharge debtors from the obligation of their contracts; and in pursuance of this power Congress has three times passed such a law, which in every instance operated on contracts made before it was passed. Such a law is now in force, yet its constitutionality has never been questioned. How it can be in accordance with the spirit of the Constitution to destroy directly the creditor's contract for the sake of the individual debtor, but contrary to its spirit to affect remotely its value for the safety of the nation, it is difficult to perceive.

So it is said that the provisions, that private property shall not be taken for public use without due compensation, and that no person shall be deprived of life, liberty, or property, without due course of law, are opposed to the acts under consideration.

The argument is too vague for my perception, by which the indirect effect of a great public measure, in depreciating the value of lands, stocks, bonds, and other contracts, renders such a law invalid as taking private property for public use, or as depriving the owner of it without due course of law.

A declaration of war with a maritime power would thus be unconstitutional, because the value of every ship abroad is lessened twenty-five or thirty per cent., and those at home almost as much. The abolition of the tariff on iron or sugar would in like manner destroy the furnaces, and sink the capital employed in the manufacture of these articles. Yet no statesman, however warm an advocate of high tariff, has claimed that to abolish such duties would be unconstitutional as taking private property.

If the principle be sound, every successive issue of gov-

ernment bonds during the war was void, because by increasing the public debt it made those already in private hands less valuable.

This whole argument of the injustice of the law, an injustice which if it ever existed will be repeated by now holding it wholly void; and of its opposition to the spirit of the Constitution, is too abstract and intangible for application to courts of justice, and is, above all, dangerous as a ground on which to declare the legislation of Congress void by the decision of a court. It would authorize this court to enforce theoretical views of the genius of the government, or vague notions of the spirit of the Constitution and of abstract justice, by declaring void laws which did not square with those views. It substitutes our ideas of policy for judicial construction, an undefined code of ethics for the Constitution, and a court of justice for the National legislature.

Upon the enactment of these legal tender laws they were received with almost universal acquiescence as valid. Payments were made in the legal tender notes for debts in existence when the law was passed, to the amount of thousands of millions of dollars, though gold was the only lawful tender when the debts were contracted. A great if not larger amount is now due under contracts made since their passage, under the belief that these legal tenders would be valid payment.

The two houses of Congress, the President who signed the bill, and fifteen State courts, being all but one that has passed upon the question, have expressed their belief in the constitutionality of these laws.

With all this great weight of authority, this strong concurrence of opinion among those who have passed upon the question, before we have been called to decide it, whose duty it was as much as it is ours to pass upon it in the light of the Constitution, are we to reverse their action, to disturb contracts, to declare the law void, because the necessity for its enactment does not appear so strong to us as it did to Congress, or so clear as it was to other courts?

Such is not my idea of the relative functions of the legis-

lative and judicial departments of the government. Where there is a choice of means the selection is with Congress, not the court. If the act to be considered is in any sense essential to the execution of an acknowledged power, the degree of that necessity is for the legislature and not for the court to determine. In the case in Wheaton, from which I have already quoted so fully, the court says that " where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretences to such a power." This sound exposition of the duties of the court in this class of cases, relieves me from any embarrassment or hesitation in the case before me. If I had entertained doubts of the constitutionality of the law, I must have held the law valid until those doubts became convictions. But as I have a very decided opinion that Congress acted within the scope of its authority, I must hold the law to be constitutional, and dissent from the opinion of the court.