HANNAH A. LOVEJOY *vs.* LEVI M. STEWART, impleaded, etc.

June 29, 1876.

**Specific Performance—Delay of Purchaser Excused.**—Action for specific performance of the condition of a bond for the conveyance of real estate. The facts found by the court below recapitulated in detail and considered, and *held* to be equitable circumstances, reasonably and sufficiently explaining the plaintiff's delay in proceeding to secure and enforce her rights under the bond.

**Tender—Legal-tender Act.**—A tender in United States treasury-notes, made December 15, 1869, in payment of a liability contracted before the passage of the legal-tender act, *held* sufficient; the decision in *Hepburn* v. *Griswold,* 8 Wall. 603, which held to the contrary, and was subsequently overthrown, not having been promulgated until January 29, 1870.

Appeal by defendant Stewart from an order of the district court for Hennepin county, *Vanderburgh,* J., presiding, refusing a new trial after a trial by the court without a jury.

*Levi M. Stewart* and *George Bradley,* for appellant.

*Lochren, McNair & Gilfillan,* for respondent.

BERRY, J.[1] The following facts are found by the court below: On September 14, 1861, the defendant Wardwell, being owner in fee of an undivided fourth part of the south half of the north-east quarter of section 36, town 29, range 24, situate in Hennepin county, executed and delivered to plaintiff a bond, in which she is described as the wife of James A. Lovejoy, as she then was and now is. The bond was duly acknowledged September 21, 1861, and duly recorded on January 31, 1867. Its condition was that Wardwell, his heirs, etc., should, upon the plaintiff's request,

[1] Cornell, J., having been of counsel, did not sit in this case.

execute and deliver a good and sufficient warranty deed of the above-described premises, upon being paid $400, on or before September 21, 1865, and interest at 5 per cent. per annum "during such time as the same shall run." At the time of the execution of the bond, and as part of the same transaction, the plaintiff executed and delivered to Wardwell her promissory note for $400, payable to him according to the terms of the bond. Plaintiff from time to time paid the annual interest on the said sum of $400 for five successive years, up to September, 1866, and enough more to make the whole amount paid on the bond $106. In the fall of 1865 and the fall of 1866, after the purchase price ($400) had become due, Wardwell informed the plaintiff that he would "let the same run and remain at interest," though no definite extension was agreed on.

In April, 1867, Wardwell, being advised that the land bonded by him was worth more than $400, and that the bond was forfeited, called upon defendant Stewart, and informed him of the bond, and that it was unpaid; and thereupon, after some negotiation, Stewart purchased of him an undivided eight acres of the same for $275, and, on or about April 22, 1867, received from him a warranty deed thereof, it being agreed that he, Stewart, "should take the risk of any litigation that might arise from the bond, free of expense to Wardwell." At the time of taking his deed, Stewart was fully advised of the existence of the bond, and examined the record of the same; but it does not appear that he had any notice of the payments which the plaintiff had made, and he made no enquiries of any one except Wardwell as to the bond, "or the relation of the parties thereto." Plaintiff and her husband and Stewart were, at the time of the negotiations between Stewart and Wardwell, and ever since have been, residents of said county of Hennepin.

Soon after the execution of the deed to Stewart, the plaintiff's husband, acting as his wife's agent, offered to

pay Wardwell the amount due on the bond, and take a deed of the land. Wardwell then expressed dissatisfaction with the price stipulated in the bond, and said that he had made an arrangement with Stewart to purchase the land and defend him against the plaintiff. Up to that time Wardwell had never demanded the money due on the bond, nor had he ever notified the plaintiff that he claimed that the bond was forfeited. Upon being informed that legal proceedings would be taken to enforce specific performance of the bond, Wardwell expressed regret at his agreement with Stewart, and promised to endeavor to have it cancelled. His application to Stewart for that purpose was, however, refused. About the middle of May, 1867, Wardwell visited plaintiff at her residence, and requested the plaintiff's husband (her said agent) to take no legal proceedings until he saw him again. He has never since seen plaintiff or her husband, but soon thereafter removed permanently from the state.

The plaintiff, having heard nothing from Wardwell between May, 1867, and the summer of 1869, made enquiry for him of Stewart at different times, and, in the spring of 1868, Stewart informed her that Wardwell had gone east, and that he (Stewart) had purchased. of him (Wardwell) the residue of the land in question, to wit, an undivided twelve acres thereof. Stewart, in fact, purchased the same or $500, and Wardwell made him a warranty deed of it, on May 29, 1868. Sometime in the summer of 1869 some negotiations were had between Stewart and the plaintiff, looking to a settlement, but they resulted in nothing. On December 15, 1869, plaintiff, in lawful money of the United States, duly tendered to Stewart the balance due under the bond, with interest, to wit, $492, and also $11.70 for taxes for one year paid by Stewart, which tender Stewart refused to accept. At the same time the plaintiff tendered to Stewart, for execution, a deed of quitclaim of the premises in controversy, which Stewart refused to execute. The tender made has been kept good.

The "plaintiff or her husband was the owner of other lands in connection with the lands in suit—parcel of said eighty-acre tract (the south half of the north-west quarter of section 36)—and possessed and occupied and cultivated the same together therewith for several years after the execution of said bond, and afterwards leased the same for pasturage; and the said James A. Lovejoy paid the taxes upon said land from the year 1857 to 1869, with the exception of the year 1868."

The court further finds that "it was at no time the intention of said Stewart to settle with said plaintiff upon the terms or consideration named in said bond, nor did he ever give plaintiff any encouragement that he would do so; that Stewart purchased the land with the full understanding that it was subject to a litigation with the plaintiff to enforce the said bond, and he did not at any time demand or require a fulfilment of the terms of the same; that no reasons appear why the plaintiff might not have brought her suit sooner against the defendant, save as aforesaid, to wit, the request and statements of said Wardwell, and the said negotiations for settlement, and the alleged hope and expectation that the said Wardwell and Stewart would in some way adjust the matter in plaintiff's interest without suit;" that the premises have greatly enhanced in value since the plaintiff's purchase thereof, when it was difficult to dispose of them; that in 1865 they were worth from $40 to $50 per acre; in December, 1869, when this action was commenced, they were worth $125 per acre, and at the time of the trial of this action, September, 1871, $300 per acre; that the plaintiff did not at any time abandon the contract for the purchase of the land, and that the note given by her has never been surrendered to her, though Stewart, upon the trial, produced and offered to surrender it.

As conclusions of law the court below finds: (1) That the bond is an instrument of such a character that specific performance thereof may be decreed against the obligor, and

the land therein described ordered to be conveyed to the obligee.    ( 2 ) That Stewart, by his purchases, succeeded to the interest of Wardwell in the lands in controversy ; but, as he was fairly put upon enquiry " as to the facts existing " between the parties to the bond, he acquired by his purchases no rights or equities superior to those of Wardwell. ( 3 ) That, in the state of facts existing between the parties to the bond at the time of Stewart's purchase in April, 1867, there had not, in fact, been any forfeiture of the bond, and " plaintiff had been guilty of no such laches as to deprive her of her right to enforce the same upon proper payment or tender ; but Wardwell had, by his acts and statements, waived strict performance of the bond, so far as time was concerned."    ( 4 ) " That the delay of the plaintiff, after the purchase by the defendant Stewart, before tendering the money due, and demand of a deed, or taking any steps to assert a legal claim to said premises by suit, is not satisfactorily and sufficiently excused in law, so as to entitle her now to enforce strict performance. in equity, except upon such equitable conditions and terms as are just in the premises."

After expressing some doubt as to what should be done in the case, the court says :  " But, since the plaintiff had paid part of the purchase-money and taxes, and been in possession, and did doubtless in good faith rely upon the fidelity of the said Wardwell, and was by his acts led to delay prompt payment, and probably expected a settlement would in some way be effected without suit, it would seem harsh to deprive her of all benefit under the contract.    On the other hand, the defendant Stewart had no practical remedy, in damages or otherwise, against the plaintiff upon the contract in question, and the plaintiff, being the moving party, was bound to use diligence.    We think, therefore, since the only change in the condition of said premises or of said parties, at the time plaintiff did assert her claim by commencing suit, was the change in the value of the prop-

erty, that the plaintiff may equitably have a decree in her favor for the specific performance of said contract, upon paying the value of said land at the time this action was commenced, $2,500, with interest, less the amount actually paid upon said land by said plaintiff, $106, the said plaintiff also to pay the taxes which have been paid on said land by the defendant Stewart, and the costs of this action.''

The first, second, and third of the foregoing conclusions of law are in accordance with well-settled and familiar rules and principles of the law relating to the specific performance of contracts for the conveyance of real property, and they are also, in our opinion, sufficiently supported by the findings of fact and the testimony. *Gill* v. *Bradley*, 21 Minn. 15. But, as to the fourth conclusion of law, we are unable to agree with the court below. If the plaintiff's delay was so long and so unexcused as to disentitle her to a specific performance, except upon the conditions imposed by the court in this case, we think she is disentitled altogether; for the imposition of these conditions is neither more nor less than for the court to make a contract for the parties— a contract which they have never entered into for themselves.

But, in our opinion, the facts found furnish a reasonable excuse for plaintiff's delay. The court has found that she took and held possession of the premises, and that she " did not at any time abandon the contract for the purchase of" the same; that, after the principal of the purchase price became due, Wardwell consented to let it run, and remain at interest, without any agreement as to time; that, after the first conveyance to Stewart, the plaintiff offered to pay Wardwell the amount due on the bond, and take a deed of the land; that, up to that time, Wardwell had never demanded the money due on the bond, or notified the plaintiff that he claimed it to have been forfeited; that Stewart has never at any time demanded or required a fulfilment of the terms of the bond; that more than the interest due on the bond up

to the time when Wardwell permanently removed from the state was paid to him before that time ; that, since such removal, (which took place in May, 1867,) neither plaintiff nor her husband has seen said Wardwell ; that the taxes were paid by plaintiff's husband, as before mentioned ; that negotiations, looking to a settlement of the matter between plaintiff and Stewart and Wardwell, were going on as late as the summer of 1869 ; that the tender to Stewart was made December 15, 1869, and in the same month the present action was commenced.

Now, the original contract was between the plaintiff and Wardwell. As to him the plaintiff is clearly not in default. She is not in default for failing to pay the principal at maturity, for such payment was waived. She is not in default for not paying it since maturity ; *first*, because he has never demanded it ; and, *second*, because it was not her duty to follow him to another state for the purpose of making or tendering payment. *Gill* v. *Bradley*, 21 Minn. 15. For the latter reason she is also not in default as to Wardwell for not paying interest since his emoval.

The purchase by which Stewart succeeded to Wardwell's interest in the land was completed May 29, 1868. His rights were, of course, no greater than Wardwell's. Time was not only not expressly made essential by the terms of the bond, but, so far as the principal was concerned, Wardwell had consented to let it run. Under these circumstances it would have been Wardwell's duty, if he had retained the land—and it was Stewart's duty as his successor— if he desired to assert a right to the property in hostility to that of the plaintiff, to take some affirmative action looking in that direction. By so doing he could have compelled the plaintiff either to elect to fulfil upon her part, by paying up the arrears on the bond, or to abandon the contract. But the court has found that he has not even demanded or required a fulfilment of the terms of the bond, and this, together with the negotiations between him and plaintiff,

clearly tend to negative the idea that he regarded the contract as abandoned.

In our opinion these facts and considerations are equitable circumstances, reasonably and sufficiently explaining the plaintiff's delay in proceeding to secure and enforce her rights under the bond. The general rule, that a party calling for a specific performance must show himself "ready, desirous, prompt, and eager," and "must come as promptly as the nature of the case will admit," does not require a party to apply for relief as soon as his right to do so accrues. It is a rule to be administered with reference to the manner in which business of the kind to which it relates is ordinarily transacted.

We arrive, then, by another route, at the general conclusion reached by the court below, viz., that the plaintiff is entitled to a specific performance of the contract evidenced by the bond. As respects the action of the court below in imposing conditions, it is not for us to disturb it; for, the plaintiff having taken no steps to review it, her acquiescence therein is to be presumed.

One or two minor points remain to be considered. It is claimed by Stewart that the tender made December 15, 1869, was insufficient, because made in United States treasury-notes. This is upon the ground that, in *Hepburn* v. *Griswold*, 8 Wall. 603, it was determined that such notes were not a legal tender in payment of debts contracted (as in this instance) before the passage of the legal-tender act. As the doctrine of that case was subsequently overthrown in the Supreme Court of the United States, it is of no importance, unless Stewart was misled by it, and, therefore, refused the tender. If he was thus misled, the case might be one for the application of the maxim, *actus curiæ neminem gravabit*. But he could not have been misled by it, for the tender was made December 15, 1869, while the decision in *Hepburn* v. *Griswold* was not promulgated until January 29, 1870. 8 Wall. 626. This disposition of this point is

irrespective of the consideration that it does not appear that any objection was taken to the tender because made in treasury-notes.

As to the claim that Wardwell's receipt was improperly received in evidence, because it was dated May 18, 1867,. a day subsequent to Stewart's first purchase, it is sufficient to say that Stewart's second purchase was made in 1868, so that, at the date of the receipt, Wardwell held the title to. a part of the premises in dispute. It was, therefore, prop-. erly received as Wardwell's admission.

Order affirmed.